(Slip Opinion)      OCTOBER TERM, 2006      1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DAVENPORT ET AL. *v.* WASHINGTON EDUCATION ASSOCIATION

CERTIORARI TO THE SURPEME COURT OF WASHINGTON

No. 05–1589.   Argued January 10, 2007—Decided June 14, 2007*

The National Labor Relations Act permits States to regulate their labor relationships with public employees.  Many States authorize public-sector unions to negotiate agency-shop agreements that entitle a union to levy fees on employees who are not union members but whom the union represents in collective bargaining.  However, the First Amendment prohibits public-sector unions from using objecting nonmembers' fees for ideological purposes not germane to the union's collective-bargaining duties, *Abood* v. *Detroit Bd. of Ed.,* 431 U. S. 209, 235–236, and such unions must therefore observe various procedural requirements to ensure that an objecting nonmember can keep his fees from being used for such purposes, *Teachers* v. *Hudson*, 475 U. S. 292, 304–310.   Washington State allows public-sector unions to charge nonmembers an agency fee equivalent to membership dues and to have the employer collect that fee through payroll deductions. An initiative approved by state voters (hereinafter §760) requires a union to obtain the nonmembers' affirmative authorization before using their fees for election-related purposes.  Respondent, a public-sector union, sent a "*Hudson* packet" to all nonmembers twice a year detailing their right to object to the use of fees for nonchargeable expenditures; respondent held any disputed fees in escrow until the *Hudson* process was complete.  In separate lawsuits, petitioners alleged that respondent had failed to obtain the affirmative authorization required by §760 before spending nonmembers' agency fees for electoral purposes.  In No. 05–1657, the trial court found a §760 vio-

——————

*Together with No. 05–1657, *Washington* v. *Washington Education Association,* also on certiorari to the same court.

lation and awarded the State monetary and injunctive relief. In No. 05–1589, another judge held that §760 provided a private right of action, certified a class of nonmembers, and stayed the proceedings pending interlocutory appeal. The State Supreme Court held that although a nonmember's failure to object after receiving the *Hudson* packet did not satisfy §760's affirmative-authorization requirement, that requirement violated the First Amendment.

*Held:* It does not violate the First Amendment for a State to require its public-sector unions to receive affirmative authorization from a nonmember before spending that nonmember's agency fees for election-related purposes. Pp. 5–13.

(a) It is undeniably unusual for a government agency to give a private entity the power to tax government employees. The notion that §760's modest limitation upon that extraordinary benefit violates the First Amendment is counterintuitive, because it is undisputed that Washington could have restricted public-sector agency fees to the portion of union dues devoted to collective bargaining, or even eliminated them entirely. Washington's far less restrictive limitation on respondent's authorization to exact money from government employees is of no greater constitutional concern. P. 5.

(b) The State Supreme Court extended this Court's agency-fee cases well beyond their proper ambit in concluding that those cases, having balanced the constitutional rights of unions and nonmembers, required a nonmember to shoulder the burden of objecting before a union can be barred from spending his fees for purposes impermissible under *Abood.* The agency-fee cases did not balance constitutional rights in such a manner because unions have no constitutional entitlement to nonmember-employees' fees. The Court has never suggested that the First Amendment is implicated whenever governments limit a union's entitlement to agency fees above and beyond what *Abood* and *Hudson* require. The constitutional floor for unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions. *Hudson*'s admonition that "'dissent is not to be presumed,'" 475 U. S., at 306, n. 16, means only that it would be improper for a court to enjoin the expenditures of all nonmembers' agency fees when a narrower remedy could satisfy statutory or constitutional limitations. Pp. 5–7.

(c) Contrary to respondent's argument, §760 is not unconstitutional under this Court's campaign-finance cases. For First Amendment purposes, it is immaterial that §760 restricts a union's use of funds only after they are within the union's possession. The fees are in the union's possession only because Washington and its union-contracting government agencies have compelled their employees to pay those fees. The campaign-finance cases deal instead with gov-

Syllabus

ernmental restrictions on how a regulated entity may spend money that has come into its possession without such coercion. Pp. 7–8.

(d) While content-based speech regulations are presumptively invalid, see, *e.g., R. A. V.* v. *St. Paul*, 505 U. S. 377, 382, strict scrutiny is unwarranted when the risk that the government may drive ideas or viewpoints from the marketplace is attenuated, such as when the government acts in a capacity other than as regulator. Thus, the government can make content-based distinctions when subsidizing speech, see, *e.g., Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 548–550, and can exclude speakers based on reasonable, viewpoint-neutral subject-matter grounds when permitting speech on government property that is a nonpublic forum, see, *e.g., Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 799–800, 806. The principle underlying those cases is applicable here. Washington voters did not impermissibly distort the marketplace of ideas when they placed a reasonable, viewpoint-neutral limitation on the State's authorization. They were seeking to protect the integrity of the election process, and their restriction was thus limited to the state-created harm that they sought to remedy. The First Amendment did not compel them to limit public-sector unions' extraordinary entitlement to nonmembers' agency fees more broadly than necessary to vindicate that concern. Pp. 8–11.

(e) Section 760 is constitutional as applied to public-sector unions. There is no need in these cases to consider its application to private-sector unions. Pp. 11–13.

No. 05–1589 and No. 05–1657, 156 Wash. 2d 543, 130 P. 3d 352, vacated and remanded.

SCALIA, J., delivered the opinion of the Court, Parts I and II–A and the second paragraph of footnote 2 of which were unanimous, and the remainder of which was joined by STEVENS, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ. BREYER, J., filed an opinion concurring in part and concurring in the judgment, in which ROBERTS, C. J., and ALITO, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 05–1589 and 05–1657

GARY DAVENPORT, ET AL., PETITIONERS
05–1589          *v.*
WASHINGTON EDUCATION ASSOCIATION

WASHINGTON, PETITIONER
05–1657          *v.*
WASHINGTON EDUCATION ASSOCIATION

ON WRITS OF CERTIORARI TO THE SUPREME COURT OF
WASHINGTON

[June 14, 2007]

JUSTICE SCALIA delivered the opinion of the Court.

The State of Washington prohibits labor unions from using the agency-shop fees of a nonmember for election-related purposes unless the nonmember affirmatively consents. We decide whether this restriction, as applied to public-sector labor unions, violates the First Amendment.

I

The National Labor Relations Act leaves States free to regulate their labor relationships with their public employees. See 49 Stat. 450, as amended, 29 U. S. C. §152(2). The labor laws of many States authorize a union and a government employer to enter into what is commonly known as an agency-shop agreement. This arrangement entitles the union to levy a fee on employees who are not union members but who are nevertheless represented by

the union in collective bargaining. See, *e.g., Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507, 511 (1991). The primary purpose of such arrangements is to prevent nonmembers from free-riding on the union's efforts, sharing the employment benefits obtained by the union's collective bargaining without sharing the costs incurred. See, *e.g., Machinists* v. *Street*, 367 U. S. 740, 760–764 (1961). However, agency-shop arrangements in the public sector raise First Amendment concerns because they force individuals to contribute money to unions as a condition of government employment. Thus, in *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209, 235–236 (1977), we held that public-sector unions are constitutionally prohibited from using the fees of objecting nonmembers for ideological purposes that are not germane to the union's collective-bargaining duties. And in *Teachers* v. *Hudson*, 475 U. S. 292, 302, 304–310 (1986), we set forth various procedural requirements that public-sector unions collecting agency fees must observe in order to ensure that an objecting nonmember can prevent the use of his fees for impermissible purposes. Neither *Hudson* nor any of our other cases, however, has held that the First Amendment mandates that a public-sector union obtain affirmative consent before spending a nonmember's agency fees for purposes not chargeable under *Abood*.

The State of Washington has authorized public-sector unions to negotiate agency-shop agreements. Where such agreements are in effect, Washington law allows the union to charge nonmembers an agency fee equivalent to the full membership dues of the union and to have this fee collected by the employer through payroll deductions. See, *e.g.,* Wash. Rev. Code §§41.56.122(1), 41.59.060(2), 41.59.100 (2006). However, §42.17.760 (hereinafter §760), which is a provision of the Fair Campaign Practices Act (a state initiative approved by the voters of Washington in 1992), restricts the union's ability to spend the agency fees that it collects. Section 760, as it stood when the decision

under review was rendered, provided:

> "A labor organization may not use agency shop fees paid by an individual who is not a member of the organization to make contributions or expenditures to influence an election or to operate a political committee, unless affirmatively authorized by the individual."[1]

Respondent, the exclusive bargaining agent for approximately 70,000 public educational employees, collected agency fees from nonmembers that it represented in collective bargaining. Consistent with its responsibilities under *Abood* and *Hudson* (or so we assume for purposes of these cases)*,* respondent sent a "*Hudson* packet" to all nonmembers twice a year, notifying them of their right to object to paying fees for nonchargeable expenditures, and giving them three options: (1) pay full agency fees by not objecting within 30 days; (2) object to paying for nonchargeable expenses and receive a rebate as calculated by respondent; or (3) object to paying for nonchargeable expenses and receive a rebate as determined by an arbitrator. Respondent held in escrow any agency fees that were reasonably in dispute until the *Hudson* process was complete.

In 2001, respondent found itself in Washington state

---

[1] Washington has since amended §760 to codify a narrower interpretation of "use" of agency-shop fees than the interpretation adopted below by the state trial court that passed on that question. See Supp. Brief for Respondent 2–3. As respondent concedes, however, *id.*, at 3, these cases are not moot. Because petitioners sought money damages for respondent's alleged violation of the prior version of §760, it still matters whether the Supreme Court of Washington was correct to hold that that version was inconsistent with the First Amendment. Our analysis of whether §760's affirmative-authorization requirement violates the constitutional rights of respondent is not affected by the amendment, which merely causes that requirement to be applicable less frequently than the state trial court thought.

courts defending, in two separate lawsuits, its expenditures of nonmembers' agency fees.  The first lawsuit was brought by the State of Washington, petitioner in No. 05–1657, and the second was brought as a putative class action by several nonmembers of the union, petitioners in No. 05–1589.  Both suits claimed that respondent's use of agency fees was in violation of §760.  Petitioners alleged that respondent had failed to obtain affirmative authorization from nonmembers before using their agency fees for the election-related purposes specified in §760.  In No. 05–1657, after a trial on the merits, the trial court found that respondent had violated §760 and awarded the State both monetary and injunctive relief.  In No. 05–1589, a different trial judge held that §760 provided a private right of action, certified the class, and stayed further proceedings pending interlocutory appeal.

After intermediate appellate court proceedings, a divided Supreme Court of Washington held that, although a nonmember's failure to object after receiving respondent's "*Hudson* packet" did not satisfy §760's affirmative-authorization requirement as a matter of state law, the statute's imposition of such a requirement violated the First Amendment of the Federal Constitution.  See *State ex rel. Washington State Public Disclosure Comm'n* v. *Washington Ed. Assn.*, 156 Wash. 2d 543, 553–571, 130 P. 3d 352, 356–365 (2006) (en banc).  The court reasoned that this Court's agency-fee jurisprudence established a balance between the First Amendment rights of unions and of nonmembers, and that §760 triggered heightened First Amendment scrutiny because it deviated from that balance by imposing on respondent the burden of confirming that a nonmember does not object to the expenditure of his agency fees for electoral purposes.  The court also held that §760 interfered with respondent's expressive associational rights under *Boy Scouts of America* v. *Dale*, 530 U. S. 640 (2000).  We granted certiorari.  548 U. S. ___

(2006).

## II

The public-sector agency-shop arrangement authorizes a union to levy fees on government employees who do not wish to join the union. Regardless of one's views as to the desirability of agency-shop agreements, see *Abood,* 431 U. S., at 225, n. 20, it is undeniably unusual for a government agency to give a private entity the power, in essence, to tax government employees. As applied to agency-shop agreements with public-sector unions like respondent, §760 is simply a condition on the union's exercise of this extraordinary power, prohibiting expenditure of a nonmember's agency fees for election-related purposes unless the nonmember affirmatively consents. The notion that this modest limitation upon an extraordinary benefit violates the First Amendment is, to say the least, counterintuitive. Respondent concedes that Washington could have gone much further, restricting public-sector agency fees to the portion of union dues devoted to collective bargaining. See Brief for Respondent 46–47. Indeed, it is uncontested that it would be constitutional for Washington to eliminate agency fees entirely. See *id.*, at 46 (citing *Lincoln Fed. Union* v. *Northwestern Iron & Metal Co.*, 335 U. S. 525 (1949)). For the reasons that follow, we conclude that the far less restrictive limitation the voters of Washington placed on respondent's authorization to exact money from government employees is of no greater constitutional concern.

## A

The principal reason the Supreme Court of Washington concluded that §760 was unconstitutional was that it believed that our agency-fee cases, having balanced the constitutional rights of unions and of nonmembers, dictated that a nonmember must shoulder the burden of

objecting before a union can be barred from spending his fees for purposes impermissible under *Abood*. See 156 Wash. 2d, at 557–563, 130 P. 3d, at 358–360. The court reached this conclusion primarily because our cases have repeatedly invoked the following proposition: "'[D]issent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee.'" *Hudson*, 475 U. S., at 306, n. 16 (quoting *Street*, 367 U. S., at 774); see also *Abood*, *supra*, at 238. The court concluded that §760 triggered heightened First Amendment scrutiny because it deviated from this perceived constitutional balance by requiring unions to obtain affirmative consent.

This interpretation of our agency-fee cases extends them well beyond their proper ambit. Those cases were not balancing constitutional rights in the manner respondent suggests, for the simple reason that unions have no constitutional entitlement to the fees of nonmember-employees. See *Lincoln Fed. Union, supra*, at 529–531. We have never suggested that the First Amendment is implicated whenever governments place limitations on a union's entitlement to agency fees above and beyond what *Abood* and *Hudson* require. To the contrary, we have described *Hudson* as "outlin[ing] a *minimum* set of procedures by which a [public-sector] union in an agency-shop relationship could meet its requirement under *Abood*." *Keller* v. *State Bar of Cal.*, 496 U. S. 1, 17 (1990) (emphasis added). The mere fact that Washington required more than the *Hudson* minimum does not trigger First Amendment scrutiny. The constitutional floor for unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions.

The Supreme Court of Washington read far too much into our admonition that "dissent is not to be presumed." We meant only that it would be improper for a court to enjoin the expenditure of the agency fees of all employees, including those who had not objected, when the statutory

or constitutional limitations established in those cases could be satisfied by a narrower remedy. See, *e.g., Street, supra*, at 768–770, 772–775 (discussing possible judicial remedies for violation of a federal statute that forbade unions from spending *objecting* employees' fees for political purposes); *Abood, supra*, at 235–236, 237–242 (discussing possible judicial remedies for a state statute that unconstitutionally authorized a public-sector union to spend *objecting* nonmembers' agency fees for ideological purposes not germane to collective bargaining); *Hudson, supra*, at 302, 304–310 (setting forth procedures necessary to prevent agency-shop arrangements from violating *Abood*). But, as the dissenting justices below correctly recognized, our repeated affirmation that *courts* have an obligation to interfere with a union's statutory entitlement no more than is necessary to vindicate the rights of non-members does not imply that legislatures (or voters) themselves cannot limit the scope of that entitlement.

### B

Respondent defends the judgment below on a ground quite different from the mistaken rationale adopted by the Supreme Court of Washington. Its argument begins with the premise that §760 is a limitation on how the union may spend "its" money, citing for that proposition the Washington Supreme Court's description of §760 as encumbering funds that are lawfully within a union's possession. Brief for Respondent 21; 156 Wash. 2d, at 568–569, 130 P. 3d, at 363–364. Relying on that premise, respondent invokes *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978), *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652 (1990), and related campaign-finance cases. It argues that, under the rigorous First Amendment scrutiny required by those cases, §760 is unconstitutional because it applies to ballot propositions and because it does not limit equivalent election-related

expenditures by corporations.

The Supreme Court of Washington's description of §760 notwithstanding, our campaign-finance cases are not on point. For purposes of the First Amendment, it is entirely immaterial that §760 restricts a union's use of funds only after those funds are already within the union's lawful possession under Washington law. What matters is that public-sector agency fees are in the union's possession only because Washington and its union-contracting government agencies have compelled their employees to pay those fees. The cases upon which respondent relies deal with governmental restrictions on how a regulated entity may spend money that has come into its possession without the assistance of governmental coercion of its employees. See, *e.g., Bellotti, supra*, at 767–768; *Austin, supra*, at 654–656. As applied to public-sector unions, §760 is not fairly described as a restriction on how the union can spend "its" money; it is a condition placed upon the union's extraordinary *state* entitlement to acquire and spend *other people's* money.[2]

---

[2] Respondent might have had a point if, as it suggests at times, the statute burdened its ability to spend the dues of its own members. But §760 restricts solely the "use [of] agency shop fees paid by an individual who is not a member." The only reason respondent's use of its members' dues was burdened is that respondent chose to commingle those dues with nonmembers' agency fees. See App. to Pet. for Cert. in No. 05–1657, pp. 99a, 105a–107a. Respondent's improvident accounting practices do not render §760 unconstitutional. We note as well that, given current technology, it will not likely be burdensome for any nonmember who wishes to do so to provide affirmative authorization for use of his fees for electoral expenditures.

For similar reasons, the Supreme Court of Washington's invocation of the union's expressive associational rights under *Boy Scouts of America* v. *Dale*, 530 U. S. 640 (2000), was quite misplaced, as respondent basically concedes by not relying upon the case. Section 760 does not compel respondent's acceptance of unwanted members or otherwise make union membership less attractive. See *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 68–69 (2006).

The question that must be asked, therefore, is whether §760 is a constitutional condition on the authorization that public-sector unions enjoy to charge government employees agency fees. Respondent essentially answers that the statute unconstitutionally draws distinctions based on the content of the union's speech, requiring affirmative consent only for election-related expenditures while permitting expenditures for the rest of the purposes not chargeable under *Abood* unless the nonmember objects. The contention that this amounts to unconstitutional content-based discrimination is off the mark.

It is true enough that content-based regulations of speech are presumptively invalid. See, *e.g., R. A. V.* v. *St. Paul*, 505 U. S. 377, 382 (1992) (citing cases). We have recognized, however, that "[t]he rationale of the general prohibition . . . is that content discrimination 'raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'" *Id.*, at 387 (quoting *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991)). And we have identified numerous situations in which that risk is inconsequential, so that strict scrutiny is unwarranted. For example, speech that is obscene or defamatory can be constitutionally proscribed because the social interest in order and morality outweighs the negligible contribution of those categories of speech to the marketplace of ideas. See, *e.g., R. A. V.,* 505 U. S., at 382–384. Similarly, content discrimination among various instances of a class of proscribable speech does not pose a threat to the marketplace of ideas when the selected subclass is chosen for the very reason that the entire class can be proscribed. See *id.,* at 388 (confirming that governments may choose to ban only the most prurient obscenity). Of particular relevance here, our cases recognize that the risk that content-based distinctions will impermissibly interfere with the marketplace of ideas is sometimes attenuated when the

government is acting in a capacity other than as regulator. Accordingly, it is well established that the government can make content-based distinctions when it subsidizes speech. See, *e.g., Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 548–550 (1983). And it is also black-letter law that, when the government permits speech on government property that is a nonpublic forum, it can exclude speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum. See, *e.g., Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 799–800, 806 (1985).

The principle underlying our treatment of those situations is equally applicable to the narrow circumstances of these cases. We do not believe that the voters of Washington impermissibly distorted the marketplace of ideas when they placed a reasonable, viewpoint-neutral limitation on the State's general authorization allowing public-sector unions to acquire and spend the money of government employees. As the Supreme Court of Washington recognized, the voters of Washington sought to protect the integrity of the election process, see 156 Wash. 2d, at 563, 130 P. 3d, at 361, which the voters evidently thought was being impaired by the infusion of money extracted from nonmembers of unions without their consent. The restriction on the state-bestowed entitlement was thus limited to the state-created harm that the voters sought to remedy. The voters did not have to enact an across-the-board limitation on the use of nonmembers' agency fees by public-sector unions in order to vindicate their more narrow concern with the integrity of the election process. We said in *R. A. V.* that, when totally proscribable speech is at issue, content-based regulation is permissible so long as "there is no realistic possibility that official suppression of ideas is afoot." 505 U. S., at 390. We think the same is true when, as here, an extraordinary and totally repeal-

able authorization to coerce payment from government employees is at issue. Even if it be thought necessary that the content limitation be reasonable and viewpoint neutral, cf. *Cornelius, supra*, at 806, the statute satisfies that requirement. Quite obviously, no suppression of ideas is afoot, since the union remains as free as any other entity to participate in the electoral process with all available funds other than the state-coerced agency fees lacking affirmative permission. Cf. *Regan, supra*, at 549–550 (First Amendment does not require the government to enhance a person's ability to speak). In sum, given the unique context of public-sector agency-shop arrangements, the content-based nature of §760 does not violate the First Amendment.

We emphasize an important limitation upon our holding: we uphold §760 only as applied to public-sector unions such as respondent. Section 760 applies on its face to both public- and private-sector unions in Washington.[3] Since private-sector unions collect agency fees through contractually required action taken by private employers rather than by government agencies, Washington's regulation of those private arrangements presents a somewhat different constitutional question.[4] We need not answer that ques-

—————

[3] Under the National Labor Relations Act, it is generally not an unfair labor practice for private-sector employers to enter into agency-shop arrangements, see 29 U. S. C. §158(a)(3), but States retain the power under the Act to ban the execution or application of such agreements, see §164(b).

[4] We do not suggest that the answer must be different. We have previously construed the authorization of private-sector agency-shop arrangements in the National Labor Relations Act in a manner that is arguably content based. See *Communications Workers* v. *Beck*, 487 U. S. 735, 738, 762–763 (1988) (§158(a)(3) authorizes expenditure of private-sector agency fees over a nonmember's objection only in furtherance of the union's obligations as exclusive bargaining representative); *Ellis* v. *Railway Clerks*, 466 U. S. 435, 450–451 (1984) (expenditures on publications that report about a union's activities as exclusive

tion today, however, because at no stage of this litigation has respondent made an overbreadth challenge. See generally *Schaumburg* v. *Citizens for Better Environment*, 444 U. S. 620, 633–634 (1980) (applying overbreadth doctrine).[5] Instead, respondent has consistently argued simply that §760 is unconstitutional as applied to itself. The only purpose for which it has noted the statute's applicability to private-sector unions is to establish that the statute was meant to be a general limitation on electoral speech, and not just a condition on state agencies' authorization of compulsory agency fees. See Brief for Respondent 24, 48. That limited contention, however, is both unconvincing and immaterial. The purpose of the voters of Washington was undoubtedly the general one of protecting the integrity of elections by limiting electoral spending in certain ways. But §760, though applicable to all unions, served that purpose through very different means depending on the type of union involved: It *conditioned* public-sector unions' authorization to coerce fees from government employees at the same time that it *regulated* private-sector unions' collective-bargaining agreements. The constitutionality of the means chosen with respect to private-sector unions has no bearing on whether §760 is constitutional as applied to public-sector unions.

––––––––––

bargaining representative can be charged to nonmembers over their objection).

[5] Nor is it clear that the "strong medicine" of the overbreadth doctrine is even available to challenge a statute such as §760. See *Virginia* v. *Hicks*, 539 U. S. 113, 118–120 (2003) (recognizing that the doctrine's benefits—eliminating the chilling effect that overbroad laws have on nonparties—must be weighed against its costs—blocking perfectly constitutional applications of a law). It may be argued that the only other targets of the statute's narrow prohibition, private-sector unions, are sufficiently capable of defending their own interests in court that they will not be significantly "chilled."

\*      \*      \*

We hold that it does not violate the First Amendment for a State to require that its public-sector unions receive affirmative authorization from a nonmember before spending that nonmember's agency fees for election-related purposes. We therefore vacate the judgment of the Supreme Court of Washington and remand the cases for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

-------------

Nos. 05–1589 and 05–1657

-------------

GARY DAVENPORT, ET AL., PETITIONERS
05–1589                         *v.*
WASHINGTON EDUCATION ASSOCIATION


WASHINGTON, PETITIONER
05–1657                         *v.*
WASHINGTON EDUCATION ASSOCIATION

ON WRITS OF CERTIORARI TO THE SUPREME COURT OF
WASHINGTON

[June 14, 2007]

JUSTICE BREYER, with whom THE CHIEF JUSTICE and JUSTICE ALITO join, concurring in part and concurring in the judgment.

I agree with the Court that the Supreme Court of Washington's decision rested entirely on flawed interpretations of this Court's agency-fee cases and our decision in *Boy Scouts of America* v. *Dale*, 530 U. S. 640 (2000). I therefore concur in the Court's judgment, and I join Parts I and II–A and the second paragraph of n. 2 of the Court's opinion. However, I do not join Part II–B, which addresses numerous arguments that respondent Washington Education Association raised for the first time in its briefs before this Court. See, *e.g.*, *State ex rel. Washington State Public Disclosure Comm'n* v. *Washington Ed. Assn.,* 156 Wash. 2d 543, 565, n. 6, 130 P. 3d 352, 362, n. 6, (2006) (en banc) (noting that one of these arguments was neither raised nor addressed below). I would not address those arguments until the lower courts have been given the opportunity to address them. See, *e.g.*, *National Collegiate Athletic Assn.* v. *Smith*, 525 U. S. 459, 469–470 (1999).