JAMES L. DENNIS, Circuit Judge,
joined by DeMOSS and GRAVES, Circuit Judges, dissenting:
Although I am in sympathy with the majority’s desire to promote strong First Amendment protection of political speech, in my view, the Supreme Court’s decisions in Ysursa v. Pocatello Education Association, 555 U.S. 353, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009), Davenport v. Washington Education Association, 551 U.S. 177, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007), and Regan v. Taxation with Representation of Washington, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), do not permit us to apply strict or heightened scrutiny necessary for us to strike down the particular type of alleged speech restriction at issue in this case.
Ysursa involved Idaho laws under which government employees were given the option of having the government, as their employer, deduct a portion of their wages to pay their union dues. Government employees, however, were not allowed to have the government deduct a portion of their wages to remit to the union’s political action committee. Unions representing Idaho public employees challenged this limitation as a violation of their First Amendment rights. The Supreme Court rejected the challenge because, the Court explained, while the First Amendment operates as a negative restraint to forbid the government from “abridging the freedom of speech,” the amendment “does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression.” 555 U.S. at 355, 129 S.Ct. 1093. The Court elaborated:
While publicly administered payroll deductions for political purposes can enhance the unions’ exercise of First Amendment rights, Idaho is under no obligation to aid the unions in their political activities. And the State’s decision not to do so is not an abridgment of the unions’ speech; they are free to engage in such speech as they see fit. They simply are barred from enlisting the State in support of that endeavor.
Id. at 359, 129 S.Ct. 1093. The challenged Idaho laws did not “restrict political speech,” the Court concluded, but merely “decline[d] to promote that speech *442 by allowing public employee checkoffs for political activities.” Id. at 355, 129 S.Ct. 1093. Thus, because the state did “not infringe[] the unions’ First Amendment rights,” the Court held that the challenged laws were subject to only “deferential” “rational basis” review. Id. at 359, 362, 129 S.Ct. 1093.
In Ysursa, the Court relied on its prior decision in Davenport, stating that it “guides our resolution here.” Id. at 360, 129 S.Ct. 1093. In Davenport, the Court addressed Washington state laws, under which unions of government employees were authorized to levy “agency fees” on employees who were not union members but were nevertheless benefited by the union’s collective bargaining. The union was not allowed, however, to spend such fees on political speech unless “affirmatively authorized” by the person from whom the fee was recovered. 551 U.S. at 182, 127 S.Ct. 2372 (quoting statute). That “affirmative authorization” restriction was at issue. The Court upheld the challenged statute, “recognizing],” as the Ysursa Court explained, “that the statute, rather than suppressing union speech, simply declined to assist that speech by granting the unions the right to charge agency fees for election activities.” Ysursa, 555 U.S. at 361, 129 S.Ct. 1093 (citing Davenport, 551 U.S. at 188-90, 127 S.Ct. 2372).
Third is Regan, on which both Ysursa and Davenport relied. There, the Court upheld the federal tax code’s refusal to provide certain tax benefits for political lobbying, explaining that, “Congress has not infringed any First Amendment rights or regulated any First Amendment activity,” but has “simply chosen not to pay for ... lobbying.” 461 U.S. at 546, 103 S.Ct. 1997. In Ysursa, the Court stated that the government’s “decision not to assist fund-raising” “is simply not the same as directly limiting expression” and cited Regan in support of the distinction. Ysursa, 555 U.S. at 360 n. 2, 129 S.Ct. 1093 (citing Regan, 461 U.S. at 550, 103 S.Ct. 1997). And in Davenport, the Court cited Regan for the proposition that the First Amendment “does not require the government to enhance a person’s ability to speak.” Davenport, 551 U.S. at 190, 127 S.Ct. 2372.
It appears to me that the Texas charitable bingo program is analogous to the circumstances addressed in Ysursa, Davenport, and Regan. The charitable bingo program should not be considered in a void, but rather in its proper context. Cf ante, at 438 (calling the argument that charitable bingo does not burden political speech “dubious at best” because the statute’s text is “targeted at political speech”). We start from the contextual premise that, as a matter of law, gambling, including bingo, “implicates no constitutionally protected right” and rather “falls into a category of ‘vice’ activity that could be, and frequently has been, banned altogether.” United States v. Edge Broad. Co., 509 U.S. 418, 426, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993); see also There to Care, Inc. v. Comm’r of Ind. Dep’t of Revenue, 19 F.3d 1165, 1167 (7th Cir.1994) (“Gambling has traditionally been closely regulated or even forbidden, without anyone suspecting that these restrictions violate the first amendment.”). And as a matter of contextual fact, in Texas, bingo and other gambling has been prohibited for most of the state’s history.
It was not until 1980 that Texas voters amended the state constitution to allow charitable bingo as an exception to the general prohibition on gambling, see Tex. Const, art. Ill, § 47, and not until 1981 that the legislature enacted the Bingo Enabling Act, see Tex. Occ.Code § 2001.001 et seq., which allows bingo to operate in the state in only very limited circumstances. Under the Act, only specified categories of religious and nonprofit organizations (cer *443 tain “religious societies,” “nonprofit organizations whose predominant activities are for the support of medical research or treatment programs,” “fraternal organizations,” “veterans organizations,” “volunteer fire departments,” and “volunteer emergency medical services providers”) are allowed, if licensed, to host bingo games on condition that they use their bingo proceeds to support the “charitable purposes” of the organization. Id. §§ 2001.101, 2001.454. They are not, however, permitted to use their bingo proceeds, but they may use any other funds, to “support or oppose a measure submitted to a vote of the people” or to “influence or attempt to influence legislation.” Id. § 2001.456.[1]
The 1981 charitable bingo program represents a legislative judgment that, although the longstanding general prohibition on gambling should stand, the social costs that support the suppression of gambling are outweighed in limited circumstances. That is, regulated bingo should be permitted, the legislature decided, if it means that health clinics for the poor have more funds for medical services, that volunteer fire departments have more funds to protect their communities, etc. The charitable bingo program is, in essence, a legislative effort at promoting those aims, which the legislature has identified as sufficiently worthy to warrant an exception to the gambling ban.
Viewed in such light, it appears, under the reasoning of Ysursa, Davenport, and Regan, that the charitable bingo program’s limitation against the use of bingo proceeds for lobbying and other political speech, which the legislature has decided not to promote, does not “suppress” that speech, thus subjecting the statute to strict or heightened scrutiny under the First Amendment. Pre-1981, before the charitable bingo program was created, the ap-pellees here could use their general funds for any political advocacy they desired. The creation of charitable bingo in 1981 did nothing to change that. Today, with the charitable bingo program in place, the appellees remain equally free to use their general funds for any political advocacy they desire. They are only restricted from using their new, post-1981 charitable bingo proceeds, which they were previously prohibited from obtaining, for political advocacy. In other words, the appellees’ only grievance with the charitable bingo program that Texas created in 1981 is that it does not “assist [them] in funding the expression of [certain political speech].” Ysursa, 555 U.S. at 358, 129 S.Ct. 1093. But, as the Supreme Court has said, the First Amendment “does not require the government to enhance a person’s ability to speak.” Davenport, 551 U.S. at 190, 127 S.Ct. 2372 (citing Regan, 461 U.S. at 549-50,103 S.Ct. 1997).
Therefore, under the reasoning of Ysur-sa, Davenport, and Regan, I respectfully dissent from the majority’s striking down the challenged parts of the Texas charitable bingo program under strict or heightened scrutiny.

. Texas law also prohibits charitable bingo licensees from using their bingo proceeds to "support or oppose a candidate or slate of candidates for public office,” but the plaintiffs-appellees here do not challenge that restriction.