JAMES E. GRAVES, Circuit Judge,
joined by DeMOSS and DENNIS, Circuit Judges, dissenting.
I fully join Judge Dennis in dissenting from the majority opinion, which strikes down the challenged parts of the Texas charitable bingo program under strict scrutiny. However I write separately to address the majority’s holdings that the Bingo Act does not create a subsidy and that the unconstitutional conditions doctrine applies in this case.
*444 The Texas Constitution bans gambling. However, in 1980, Texas voters approved an amendment establishing an exception for charitable bingo. The Texas Bingo Enabling Act, passed in 1981, allows qualifying Texas charities to obtain a license to hold bingo games so long as all proceeds are spent in Texas and used for charitable purposes. The Act prohibits the use of bingo proceeds to support or oppose political candidates, to support or oppose ballot measures, or for lobbying. However, charities are not prohibited from using their own money for these purposes.
The Charities brought a facial challenge of the Act, asserting that the restrictions violate their First Amendment rights to free speech. The district court agreed and granted summary judgment for the charities. The district court also granted an injunction preventing enforcement of the challenged provisions. A panel of this court reversed the district court. On en banc rehearing, the majority now affirms the district court’s permanent injunction and summary judgment. In affirming the district court, the majority concludes that the Bingo Act does not provide a subsidy to the Charities and that it includes unconstitutional conditions. I disagree.
In general terms, “the unconstitutional-conditions doctrine examines the extent to which government benefits may be conditioned or distributed in ways that burden constitutional rights or principles.” Pace v. Bogalusa City Sch. Bd., 403 F.3d 272, 286 (5th Cir.2005). One of the most frequently cited cases discussing the doctrine is Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). That case involved a claim by a professor at a state university alleging that his right to free speech was violated because he was discharged for publicly criticizing the university’s administrative policies. Id. at 594-96, 92 S.Ct. 2694. The Court held that the denial of a government benefit (a teaching position) cannot be predicated on the exercise of a constitutional right.
However, the Supreme Court has also held that when the government provides a subsidy it is entitled to define the parameters of the subsidized program, even if that means excluding certain types of speech. The Supreme Court explained this principle in Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). In Rust, the Court held that the unconstitutional conditions doctrine did not apply because “the Government is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized. The ... regulations do not force the ... grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from [program] activities.” Id. at 196, 111 S.Ct. 1759. Responding to the service providers’ argument that the speech restrictions constituted impermissible viewpoint discrimination, the Court expounded on the concept that government may subsidize certain activities and not others:
The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of another. A legislature’s decision not to subsidize the exercise of a fundamental right does not infringe the right. A refusal to fund protected activity, without more, cannot be equated with the imposition of a penalty on that activity. There is a basic difference between direct state interference with a protected activity and state encourage *445 ment of an alternative activity consonant with legislative policy.
Id. at 193, 111 S.Ct. 1759 (emphasis added) (internal quotations and citations omitted).
The Court also applied this principle in Regan v. Taxation with Representation of Washington, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), which involved restrictions similar to those at issue here. In Regan, the Court held that the statute prohibiting tax exemptions for organizations whose activities include a substantial amount of lobbying did not violate the unconstitutional conditions doctrine. Specifically, the Court noted that the plaintiff remained free to exercise its speech rights (lobby) outside the scope of the government tax exemption program. Id. at 544-45, 103 S.Ct. 1997. The Court equated the tax exemption to a government subsidy and held that the restrictions were simply a choice by the government not to subsidize lobbying. Id. at 544, 545-46, 103 S.Ct. 1997. The Court made clear that the government’s decision not to subsidize the exercise of a constitutional right does not equate to a penalty on the right. See id. at 546, 103 S.Ct. 1997 (“Congress has not infringed any First Amendment rights or regulated any First Amendment activity. Congress has simply chosen not to pay for [plaintiffs] lobbying.”); id. at 549, 103 S.Ct. 1997 (“We have held in several contexts that a legislature’s decision not to subsidize the exercise of a fundamental right does not infringe the right....”); see also United States v. Am. Library Ass’n, Inc., 539 U.S. 194, 210-12, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (rejecting an argument that libraries’ speech rights were violated by requiring that they restrict internet access in order to receive a federal subsidy because “[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a ‘penalty’ on that activity” (quoting Rust, 500 U.S. at 193, 111 S.Ct. 1759)).
The Charities argue, and the majority agrees, that the State’s charitable bingo program cannot be construed as a subsidy because it is implemented by means of a licensing scheme instead of cash payments or tax exemptions. The majority concludes that Rust and Regan are distinguishable because “no public monies or ‘spending’ by the state are involved” in the bingo program in Texas. (Maj. Op. at 436). I disagree, as these arguments place form over substance. In creating the charitable bingo program, the State established a narrow exception to the State’s ban on bingo in order to allow a limited group of charities to conduct bingo games, free of competition, to generate extra revenue. As the Texas Constitution makes clear, this extra revenue is authorized to the limited extent that it is used for the charitable purposes of the organization. See Tex. Const, art. Ill, § 47(b). That this supplemental income stream is accessible by way of a license, instead of cash payments or a tax exemption, does not change the fact that the bingo program constitutes a government subsidy for participating charities. Notwithstanding the existence of this income stream, the State also spends money to run the program, as discussed more fully below.
The majority says that the Commission “contorts the definition of ‘subsidy’ ” and cites Black’s Law Dictionary before concluding that “[t]here is no direct or indirect receipt of funds from the public fisc.” (Maj. Op. at 436, 436). However, the definition quoted by the majority does not include any such statement requiring “direct or indirect receipt of funds from the public fisc.” (Maj. Op. at 436). The definition merely says a “grant, made by the government, to any enterprise whose promotion is considered to be in the public interest.” Black’s Law Dictionary 1565 (9th ed.2009). The majority then concedes that there is, in fact, a grant by the gov- *446 eminent here, i.e., “the legislative authority to conduct what would be illegal otherwise — bingo games.” (Maj. Op. at 436). The majority also concedes that the bingo program involves public monies and spending by the state. Specifically, the bingo program requires Texas to spend money not only on licensing, but also to essentially run a “law enforcement agency” and regulate “all bingo-related activities, including the types of games played, game frequency and times, and bingo-employee qualifications.” (Maj. Op. at 437, 437).
While some of these are regulatory costs, the majority cites no controlling authority for its conclusion that a bingo program is a regulatory scheme, which is akin to an occupational license and, thus, cannot be a subsidy. The majority cites a district court case from Virginia for the statement that, “simply because both subsidies and licenses enure a benefit does not mean they are one and the same-[The government] may not use its regulatory powers to influence or penalize speech.” Satellite Broad. & Commc’ns Ass’n of Am. v. FCC, 146 F.Supp.2d 803, 830 (E.D.Va.2001), aff'd, 275 F.3d 337 (4th Cir.2001). Notably, the Fourth Circuit found it unnecessary to address the argument of whether the statutory copyright license should be seen as a targeted government subsidy because they found that the rule in question was consistent with the First Amendment. Satellite Broad. & Commc’ns Ass’n of Am., 275 F.3d at 355, n. 6.
There are, of course, many significant distinctions between a commercial occupational license and a state charitable gaming program, created by the state constitution, that allows select charities to raise extra money through a gambling activity on the condition the money is used for the organizations’ charitable purpose. Thus, under the definition of “subsidy” and the applicable case law of Rust and Regan, the government may attach speech restrictions to the bingo funds. See also Ysursa v. Pocatello Educ. Ass’n, 555 U.S. 353, 359, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009); Davenport v. Washington Educ. Ass’n, 551 U.S. 177, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007).
The Charities and the district court relied on Citizens United v. Federal Election Commission, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), to support the conclusion that the challenged provisions are facially unconstitutional under the First Amendment because they burden political speech. But, Citizens United is distinguishable in two key respects. Citizens United involved a challenge to a federal statute prohibiting corporations from making expenditures for speech relating to federal elections. Id. at 320-21, 130 S.Ct. 876. Unlike this case, Citizens United did not involve speech restrictions in the context of a government subsidy. Here, the State has created a subsidy program where select charities are permitted to engage in a gambling activity in order to raise extra money for their charitable causes. As a condition of participating in the program, and receiving the extra money, the state requires that the money not be used for political advocacy. This requirement does not penalize political speech; it simply represents a decision by the State not to subsidize that activity. See Rust, 500 U.S. at 193, 111 S.Ct. 1759 (“A legislature’s decision not to subsidize the exercise of a fundamental right does not infringe the right.” (quoting Regan, 461 U.S. at 549, 103 S.Ct. 1997)); see also Am. Library Ass’n, 539 U.S. at 211-12, 123 S.Ct. 2297.
Citizens United is also distinguishable in that it involved a statute that imposed *447 an “outright ban” on specific types of political speech. Citizens United, 558 U.S. at 337, 130 S.Ct. 876. In other words, the restrictions in Citizens United completely foreclosed any way for corporations to engage in the prohibited political speech. Id. However, the provisions at issue in this case only prohibit the use of bingo proceeds for political advocacy and, therefore, only restrict speech within the scope of the State’s charitable bingo program. As explained in Rust, the unconstitutional conditions doctrine is implicated when government requires, as a condition of participating in a government program, that the participant not exercise a constitutional right outside the scope of the program. See Rust, 500 U.S. at 197, 111 S.Ct. 1759 (“[0]ur ‘unconstitutional conditions’ cases involve situations in which the Government has placed a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program.”); see also Agency for Int’l Dev. v. Alliance for Open Soc’y Int’l, Inc., No. 12-10, 570 U.S. -, 133 S.Ct. 2321, 2328-31, 186 L.Ed.2d 398 (2013) (reaffirming this principle). The Bingo Act’s political advocacy restrictions fall within the government’s power to subsidize some activities to the exclusion of others and therefore do not penalize political speech. As the Charities are not prohibited from engaging in lobbying or political speech outside the scope of the bingo program, the unconstitutional conditions doctrine is not implicated here.
Moreover, even if the unconstitutional conditions doctrine was implicated here, as Judge Dennis says, strict scrutiny is not appropriate. Rather, the Commission would merely have to establish, at the very most, a substantial state interest to justify the challenged provisions.[1] The majority concedes that the Supreme Court has recognized the Commission’s first interest of regulating gambling as a substantial state interest. See Greater New Orleans Broad. Ass’n v. United States, 527 U.S. 173, 185-86, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999). (Maj. Op. at 439).[2]
For the reasons stated herein, the challenged provisions in this case do nothing to restrict speech outside the scope of the State’s bingo program. Charities are free to participate in the bingo program and to engage in political advocacy; they simply must not use bingo proceeds to do so. The Bingo Act’s restrictions on the use of bingo proceeds for political advocacy are permissible conditions on a government subsidy and do not operate to penalize speech. Thus, I respectfully dissent.

. I am not suggesting that intermediate scrutiny applies.

. The majority takes issue with Texas' interest in regulating gambling based on the ability of horse and dog racetrack operators being able to engage in "unfettered political advocacy.” (Maj. Op. at 440). Despite the fact that Charities also enjoy a nonprofit or charity, if you will, status and the ability to conduct bingo games unavailable to for-profit horse and dog racetrack operators, the Charities are able to engage in "unfettered political advocacy” with their own money.