TJOFLAT, Circuit Judge,
dissenting:
Although I strongly disagree with the result reached by the majority, I write separately to directly address a question studiously avoided by this Court — -What level of First Amendment scrutiny applies to the challenged provisions of the Florida Firearm Owners Privacy Act (the “Act”)[1] targeting speech?[2]
I fully agree with my colleagues that the inquiry, record-keeping, and anti-harassment[3] provisions of the Act consti *1331 tute content-based regulations of speech specifically targeting medical professionals. Accordingly, these challenged provisions must survive some level of First Amendment scrutiny under the Free Speech Clause. I also agree that rational basis review is inapplicable here for largely the same reasons ably outlined by majority opinion. However, by declining to elucidate and apply a particularized standard of review, the majority missed a critical opportunity to provide much needed doctrinal clarification in the wake of the Supreme Court’s recent decision in Reed v. Town of Gilbert, Ariz., — U.S. -, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). Given the uncertainty introduced by Reed, I write separately to lay out what is, in my view, the logical path forward for First Amendment doctrine.
To understand Reed’s pernicious and far reaching effects, I first provide a brief overview of Free Speech principles as they existed prior to the decision. As any fledgling lawyer quickly realizes during bar preparation, the judicial approach to the Free Speech Clause notably emphasizes categorization, with each category designed to address the unique legal considerations posed by a specific form of speech. See Rodney A. Smolla, Professional Speech and the First Amendment, 119 W. Va. L. Rev. 67, 82-84 (2016); Kovacs v. Cooper, 336 U.S. 77, 97, 69 S.Ct. 448, 459, 93 L.Ed. 513 (1949) (Jackson, J., concurring) (summarizing the numerous jurisprudential labels deployed in service of protecting speech under the First Amendment by noting that “[t]he moving picture screen, the radio, the newspaper, the handbill, the sound truck and the street corner orator have differing natures, values, abuses and dangers. Each, in my view, is a law unto itself’). But despite its apparent complexity, the myriad categories of contemporary First Amendment jurisprudence are united by a common focus on distinguishing regulations that target speech based on content from those that do not. See, e.g., 1 Rodney A. Smolla, Smolla and Nimmer on Freedom of Speech, § 2:66 (2016).
As a general rule, if the government seeks to regulate speech based on content, “the usual presumption of constitutionality afforded congressional enactments is reversed; content-based regulations are presumptively invalid under the First Amendment.” 16A Am. Jur. 2d Constitutional Law § 476 (2016). See also One World One Family Now v. City of Miami Beach, 175 F.3d 1282, 1286 (11th Cir. 1999) (explaining that government regulations that discriminate against protected speech based on content are subject to strict scrutiny). The Supreme Court justifies this intense level of scrutiny on two theoretical grounds. First, content-based regulations of speech threaten the existence of “an uninhibited marketplace of ideas in which truth will ultimately prevail.” McCullen v. Coakley, — U.S. -, 134 S.Ct. 2518, 2529, 189 L.Ed.2d 502 (2014) (quotations omitted). Indeed, these regulations “raise[ ] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace” altogether. Davenport v. Washington Educ. Ass’n, 551 U.S. 177, 188, 127 S.Ct. 2372, 2381, 168 L.Ed.2d 71 (2007) (quotations and citation omitted).[4] Second, content-based regulations of speech suggest that *1332 the government may act out of “hostility— or favoritism — towards the underlying message expressed.” R.A.V. v. St. Paul, 505 U.S. 377, 386, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992). Under our system of government, this assessment is simply, not one appropriate “for the government to make ... [because] civic discourse belongs to the people.” Citizens United v. Federal Election Comm’n, 558 U.S. 310, 372, 130 S.Ct. 876, 917, 175 L.Ed.2d 753 (2010).
On the other hand, content neutral regulations likely fail to directly implicate these core First Amendment concerns, and so, “strict scrutiny is [typically] unwarranted.” Davenport, 551 U.S. at 188, 127 S.Ct. at 2381. Instead, courts usually subject content neutral regulations to intermediate scrutiny. See, e.g., Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 662, 114 S.Ct. 2445, 2469, 129 L.Ed.2d 497 (1994); Bell v. City of Winter Park, Fla., 745 F.3d 1318, 1322 (11th Cir. 2014). Under this level of scrutiny, courts sustain .content neutral regulations if they “further[] an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.” United States v. O’Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).
The test for content neutrality turns on “ ‘whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government’s purpose, is the controlling consideration.’ ” Bell, 745 F.3d at 1322 n.6 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989)). A regulation is content neutral as long as it “serves purposes unrelated to the content of expression” even if the regulation imposes incidental effects on particular speakers or messages. Ward, 491 U.S. at 791, 109 S.Ct. at 2754. In short, regulation of expressive activity protected under the First Amendment is content neutral if the regulation is “ ‘justified without reference to the content of the regulated speech.’ ” Id. (emphasis original) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). Given the significantly less stringent scrutiny that content neutral regulations receive, this initial determination plays a critical role in the survival of a law challenged under the First Amendment.
Reed announced a- sea change in the traditional test for content neutrality un *1333 der the First Amendment, and, in the process, expanded the number of previously permissible regulations now presumptively invalid under strict scrutiny. In Reed, the Supreme Court explained that “[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.” Reed, 135 S.Ct. at 2227. Under this new approach to content neutrality, the reviewing court must “consider whether a regulation of speech ‘on its face’ draws distinctions based on the message a speaker conveys.” Id. (quoting Sorrell v. IMS Health Inc., 564 U.S. 552, 131 S.Ct. 2653, 2664, 180 L.Ed.2d 544 (2011)). Courts must subject regulations that facially discriminate against speech on the basis bf content to strict scrutiny, “regardless of the government’s benign motive, content-neutral justification, or lack of ‘animus toward the ideas contained’ in the regulated speech.” Id. at 2228 (quoting Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429, 113 S.Ct. 1505, 1516, 123 L.Ed.2d 99 (1993)). Even facially neutral regulations count as content-based if they cannot be “justified without reference to the content of the regulated speech.” Id.
The concurring Justices in Reed noted the astonishing breadth of this newly announced standard for identifying content-based regulations and its potential to greatly expand the number of laws subjected to presumptive invalidity under strict scrutiny. Id. at 2235 (Breyer, J., concurring) (expressing concern that the new rule announced in Reed will unavoidably result in “the application of strict scrutiny to all sorts of justifiable governmental regulations”); Id. at 2239 (Kagan, J., concurring) (arguing that the majority approach in Reed forces lower courts to “strike down [reasonable] democratically enacted local laws even though no one— certainly not the majority — has ever explained why the vindication of First Amendment values requires that result.”). The experiences of our sister circuits show these Justices’ concerns were well founded. See Norton v. City of Springfield, Ill., 806 F.3d 411, 412-13 (7th Cir. 2015) (granting a petition for rehearing and reversing the prior panel decision based on Reed’s expansive new understanding of the types of regulations appropriately subjected to strict scrutiny due to discrimination based on content); Cahaly v. Larosa, 796 F.3d 399, 404-05 (4th Cir. 2015) (outlining Reed’s abrogation of the Fourth Circuit’s previous understanding of content neutrality and applying strict scrutiny to a law regulating robocalls in South Carolina). The First Amendment trajectory created by the Reed majority carries with it the dangerous potential to legitimize judicial interference in the implementation of reasonable, democratically enacted laws. The First Amendment does not require such rigorous interventionism, so I outline an alternative path — one that both effectuates core First Amendment values and avoids excessive judicial interference in the everyday process of government.
Established First Amendment doctrine offers lower courts many opportunities to narrow Reed’s scope via cordoning speech into particular jurisprudential categories subject to less intensive forms of judicial review. See, e.g., Note, Free Speech Doctrine after Reed v. Town of Gilbert, 129 Harv. L. Rev. 1981, 1987 (2016) (outlining available strategies for lower courts to limit Reed’s destabilizing influence on First Amendment jurisprudence). Many of our sister courts availed themselves of those very opportunities. See, e.g., United States v. Swisher, 811 F.3d 299, 313 (9th Cir. 2016) (noting that certain “traditional categories of content-based restrictions that *1334 are not subject to strict scrutiny under the First Amendment”); Expressions Hair Design v. Schneiderman, 808 F.3d 118, 131-32 (2d Cir. 2015) (relying on the threshold distinction between speech and conduct not implicated by Reed to find that a challenged law regulated only conduct, not speech, and thus failed to trigger constitutional scrutiny under the First Amendment); In re Tam, 808 F.3d 1321, 1337-39 (Fed. Cir. 2015) (en banc) (emphasizing the critical importance of categorizing speech as commercial for purposes of avoiding the application of strict scrutiny); CTIA-The Wireless Association v. City of Berkeley, Cal., 139 F.Supp.3d 1048, 1061 (N.D. Cal. 2015) (noting that “the Supreme Court has clearly made a distinction between commercial speech and noncommercial speech ... and nothing in its recent opinions, including Reed, even comes close to suggesting that that well-established distinction is no longer valid”).[5] Indeed, a longstanding hallmark of our approach to the First Amendment recognizes that
our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are “of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.”
R.A.V., 505 U.S. at 382-83, 112 S.Ct. at 2542-43 (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 762, 86 L.Ed. 1031 (1942)). Given this context, it seems likely that courts will increasingly rely on a First Amendment “jurisprudence of labels” to avoid Reed’s, outcome determinative approach to identifying content-based regulations. Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 484, 129 S.Ct. 1125, 1140, 172 L.Ed.2d 853 (2009) (Breyer, J., concurring).
However, I am not convinced that relying on formalistic line drawing exercises provides the proper solution. In my view, as in Justice Breyer’s, “[t]he First Amendment requires greater judicial sensitivity both to the Amendment’s expressive objectives and to the public’s legitimate need for regulation than [is provided by] a simple recitation of categories.” Reed, 135 S.Ct. at 2234 (Breyer, J., concurring). Rather than relying on strict categorical definitions as automatic triggers for particular levels of constitutional scrutiny, we should instead embrace an approach focused on the values underlying the jurisprudential significance of those categories. See id. Under this approach, we determine the appropriate level of scrutiny to apply to a challenged regulation by asking “whether the regulation at issue works harm to First Amendment interests that is disproportionate in light of the relevant regulatory objectives.” Id. at 2235-36. Of course, the familiar factors underlying First Amendment doctrine guide this inquiry, including “the seriousness of the harm to speech, the importance of the countervailing objectives, the extent to which the law will *1335 achieve those objectives, and whether there are other, less restrictive ways of doing so.” Id. at 2236. The more directly a challenged regulation impinges on speech without adequate reasons for doing so, the higher the level of constitutional scrutiny applied to the law.
I do not suggest that identifying a regulation as content-based no longer serves a purpose in our First Amendment inquiry. But rather than serving as an “automatic trigger” for strict scrutiny, it instead acts as a proxy indicating a heightened possibility that the government seeks to imper-missibly favor a particular viewpoint, or otherwise lacks adequate justification for legislative action. Id. at 2234. Under this approach, a more searching analysis of content-based regulations remains justifiable, but the mere presence of content discrimination, without more, need not warrant a presumption of invalidity under the First Amendment. Id.
Relying on the mere presence of content discrimination as the determinative factor for applying strict scrutiny under the First Amendment risks invalidating a swath of reasonable government regulations. As Justice Breyer pointed out in Reed, “virtually all government activities involve speech, many of which involve the regulation of speech. Regulatory programs almost always require content discrimination.” Id. at 2234. And this problem becomes increasingly pronounced given Reed’s dramatic expansion of the traditional test for content neutrality. This sliding scale of constitutional scrutiny is undoubtedly more difficult to apply than the rote formalism of current First Amendment doctrine. But this approach properly centers our analysis on the relative importance of the First Amendment values implicated by a particular regulation, while preventing undesirable judicial interference in the everyday business of government.
Here, the majority correctly finds that the record-keeping, inquiry, and anti-harassment provisions of the Act discriminate against speech based on content. But under the doctrinal principles outlined above, only intermediate scrutiny is appropriate. As extensively discussed in the pri- or panel opinion, the Act represents Florida’s attempt to regulate a very specific part of the relationship between medical professional and patient. See Wollschlaeger v. Governor of Fla., 814 F.3d 1159, 1167-68 (11th Cir. 2015), vacated, 649 Fed.Appx. 647 (11th Cir. 2016). It does not prevent medical professionals from speaking publicly about firearms, nor does it prevent medical professionals from speaking privately to patients about firearms so long as the physician determined in good faith the relevancy of such discussion to the patient’s medical care, safety, or the safety of others. The Act’s narrow restrictions specifically relate to the provision of medical care, and, as such, avoid implicating the core values the First Amendment is designed to protect.
States traditionally possessed the authority to establish the bounds of good medical practice. See, e.g., Gonzales v. Oregon, 546 U.S. 243, 271, 126 S.Ct. 904, 923, 163 L.Ed.2d 748 (2006) (noting that “regulation of health and safety is primarily, and historically, a matter of local concern” (quotations omitted)). Two central policy goals underwrite this expansive regulatory authority. First, doctors and other medical personnel are professionals, a concept that presupposes the existence of a code of behavior and some element of state control over that code in order to “safeguard! ] the interests of the public who partake in ... *1336 professional services.” Smolla, Professional Speech and the First Amendment, supra at 100. Second, medical professionals are fiduciaries of their patients, and like other fiduciaries, typically possess “superi- or knowledge, expertise, experience, and stature in relation to the client that inherently places the professional in a position of superior leverage and influence.” Id. This substantial imbalance of power; coupled with the need for patients to defer to their doctor during treatment logically necessitates state regulatipn of the medical profession to protect patients from the significant potential abuse that exists both within a specific fiduciary relationship and more broadly within the medical profession itself.
Of course, as extensively described in the panel opinion, not all speech by medical professionals implicates these strong state interests in regulation. See Wollschlaeger, 814 F.3d at 1186-92. Common sense tells us that “[t]here is a difference, for First Amendment purposes, between regulating professionals’ speech to the public at large versus their direct, personalized speech with clients.” Locke v. Shore, 634 F.3d 1185, 1191 (11th Cir. 2011). In situations where a doctor speaks on political matters outside of her professional expertise, the usual justifications for stringent state regulation of medical professionals are nonexistent. See Pickup v. Broum, 740 F.3d 1208, 1227-28 (9th Cir. 2013) (noting that “outside the doctor-patient relationship, doctors are constitutionally equivalent to soapbox orators and pamphleteers, and their speech receives robust protection under the First Amendment”). In other situations, a doctor may speak to her patient within the confines of their existing fiduciary relationship, but regarding a matter not pertaining to medical care. Although not directly related to the doctor’s duty as a professional, this form of speech still implicates the state’s interest in insuring that the fiduciary relationship between doctors and patients avoids exploitation, and, accordingly, the doctor’s speech is subject to less stringent First Amendment protection than would apply to her public speech on matters of general political interest. See Goldfarb v. Virginia State Bar, 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572 (1975) (explaining that the state’s interest in public health and safety generates a “broad power to establish standards for licensing practitioners and regulating the practice of professions”); Wollschlaeger, 814 F.3d at 1187-88.
The challenged Act directly regulates speech between a medical professional and a patient on matters relevant to the provision of appropriate medical care. This form of speech implicates the state’s exceedingly strong regulatory interest in both ensuring that doctors maintain proper professional standards and the state adequately protects patients in their dealings with medical professionals. See, e.g., Thomas v. Collins, 323 U.S. 516, 545, 65 S.Ct. 315, 329, 89 L.Ed. 430 (1945) (Jackson, J., concurring) (noting the duty on the part of the state to “shield[] the public against the untrustworthy, the incompetent, or the irresponsible” professional); Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588-89, 23 L.Ed. 328 (1875) (recognizing the traditional ability of the law to regulate fiduciary relationships as a doctrine founded on “the soundest morality”). Undoubtedly, as the majority identifies, the Act discriminates based on content. But, this simple categorization, standing alone, insufficiently justifies the presumption of constitutional infirmity accompanying the application of strict scrutiny. The fact that the Act discriminates based on content is simply a *1337 helpful, but not dispositive, legal tool. See Reed, 135 S.Ct. at 2235 (Breyer, J., dissenting). Balancing the First Amendment risks posed by allowing content discrimination against the longstanding tradition of government regulation of medical professionals engaged in practice suggests that we should apply intermediate, rather than strict, scrutiny to the Act.
Relevant Supreme Court precedent buttresses this imminently sensible conclusion. For example, in cases where a professional generally speaks to the public on a matter unrelated to her profession, the state lacks a particularized justification for regulating the content of that speech. Accordingly, the Supreme Court subjected content-based government regulations in that area to strict constitutional scrutiny. See, e.g., City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp’t. Relations Comm’n, 429 U.S. 167, 176, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976) (explaining that “[the government] may not ... discriminate between speakers on the basis of their employment. ...”).
On the other hand, when a professional speaks to the public on an issue related to the practice of her profession, the state’s traditional regulatory interest in managing the professions come into play. Correspondingly, courts typically subject content-based speech regulations in that context to intermediate scrutiny. See Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978) (concluding that this form of speech deserves a less searching form of constitutional scrutiny because of the longstanding state regulation of this type of expressive content). Based on the same tradition of regulation, the Supreme Court concluded that content discriminatory regulations of speech that occur in the context of a doctor discussing the risks of abortion and child birth with a patient merit heightened, rather than strict, scrutiny: See Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 884, 112 S.Ct. 2791, 2824, 120 L.Ed.2d 674 (1992) (joint opinion).
As the panel opinion explained, the Supreme Court’s pattern of decisions, at least prior to Reed, form a clear trend:
When the State seeks to impose content-based restrictions on speech in a context in which its regulatory interests are diminished, such ■ as when a professional speaks to the public in a nonprofessional capacity, courts apply the most exacting scrutiny. When the State seeks to regulate speech by professionals in a context in which the State’s interest in regulating for the protection of the public is more deeply rooted, a lesser level of scrutiny applies.
Wollschlaeger, 814 F.3d at 1191. In light of the confusion Reed introduced into this already complex area of legal doctrine, we should hold that government regulations involving professional speech within a fiduciary relationship.are subject only to intermediate scrutiny under the First Amendment. Otherwise, we risk continuing confusion among state legislatures over which previously acceptable regulations Reed rendered presumptively unconstitutional.
Although I respectfully disagree with the determination that the challenged regulation fails heightened scrutiny — or, as I refer to it here, intermediate scrutiny — I refrain from fully retracing the exhaustive analysis to that effect outlined in the panel opinion. See Wollschlaeger, 824 F.3d at 1192-02. Instead, I wish to merely reiterate my continuing belief that the Act before us fails to represent an attempt to *1338 “drive certain ideas or viewpoints from the marketplace” or otherwise impermissibly manipulate public discussion under the guise of regulation. Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 116, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991). Instead, the Act merely
codifies the commonsense conclusion that good medical care does not require inquiry or record-keeping regarding firearms when unnecessary to a patient’s care — especially not when that inquiry or record-keeping constitutes such a substantial intrusion upon patient privacy — and that good medical care never requires the discrimination [against] or harassment of firearm owners.
Wollschlaeger, 814 F.3d at 1168.
The majority and I agree that Florida possesses a substantial interest in protecting both Floridians’ reasonable expectation of privacy during medical treatment and the full exercise of their Second Amendment rights. If that is so, then it is hard to imagine a law more precisely tailored to advance those substantial state interests than the one presently before us. The Act does not categorically restrict the speech of medical professionals on the subject of firearms. Instead, it simply requires an individualized, good faith judgment of the necessity of speech related to firearm ownership to provide competent medical care to a patient. The individualized assessment of medical appropriateness required under the Act does not foreclose the ability of a physician to question a patient, but instead carefully weighs that right against Florida’s undoubtedly substantial interest in regulating the medical profession to protect the constitutional rights of all Floridians. In my judgment, the Act “narrowly protects patients in a focused manner in order to advance the State’s compelling interest in protecting the Second Amendment’s guarantee to keep and bear arms and patients’ privacy rights in their medical records, exactly the sort of tailoring [even] ■ strict scrutiny requires.” Id. at 1201. Therefore, I respectfully dissent from my colleagues’ judgment that the First Amendment requires us to declare Florida’s well-considered legislative enactment unconstitutional.
Appendix
Fla. Stat. § 790.338. Medical privacy concerning firearms; prohibitions; penalties; exceptions
(1) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 may not intentionally enter any disclosed information concerning firearm ownership into the patient’s medical record if the practitioner knows that such information is not relevant to the patient’s medical care or safety, or the safety of others.
(2) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient’s right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient’s medical care or safety, or the safety of others, may make such a verbal or written inquiry.
*1339 (3) Any emergency medical technician or paramedic acting under the supervision of an emergency medical services medical director under chapter 401 may make an inquiry concerning the possession or presence of a firearm if he or she, in good faith, believes that information regarding the possession of a firearm by the patient or the presence of a firearm in the home or domicile of a patient or a patient’s family member is necessary to treat a patient during the course and scope of a medical emergency or that the presence or possession of a firearm would pose an imminent danger or threat to the patient or others.
(4) A patient may decline to answer or provide any information regarding ownership of a firearm by the patient or a family member of the patient, or the presence of a firearm in the domicile of the patient or a family member of the patient. A patient’s decision not to answer a question relating to the presence or ownership of a firearm does not alter existing law regarding a physician’s authorization to choose his or her patients.
(5) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 may not discriminate against a patient based solely upon the patient’s exercise of the constitutional right to own and possess firearms or ammunition.
(6) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient’s legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination.
(7) An insurer issuing any type of insurance policy pursuant to chapter 627 may not deny coverage, increase any premium, or otherwise discriminate against any insured or applicant for insurance on the basis of or upon reliance upon the lawful ownership or possession of a firearm or ammunition or the lawful use or storage of a firearm or ammunition. Nothing herein shall prevent an insurer from considering the fair market value of firearms or ammunition in the setting of premiums for scheduled personal property coverage.
(8)Violations of the provisions of subsections (1) — (4) constitute grounds for disciplinary action under ss. 456.072(2) and 395.1055.

. Fla. Stat. § 790.338(l)-(2), (5), (6).

. I join the majority’s extensive and well-reasoned finding that the group of physicians and physician-advocacy groups (the "Plaintiffs”) mounting a facial challenge to the Act have standing to pursue that challenge. Further, the majority correctly holds that the Act's anti-discrimination provision, Fla. Stat. § 790.338(5), applies to non-expressive conduct, making that provision immune from the First Amendment challenge brought here.

. The majority holds that the anti-harassment provision of the Act, Fla. Stat. § 790.338(6), is unconstitutionally vague. This provision requires health-care practitioners to “respect a patient’s legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination.” Fla. Stat. § 790.338(6). According to the majority, the use of the adverb unnecessarily is sufficient to render this provision incomprehensible. I disagree. Perhaps in insolation, the adverb unnecessarily creates some level of confusion, but statutory construction is a holistic endeav- or, and we are commanded to interpret words in light of our "reading the whole statutory text [and] considering the purpose and context of the statute” as a whole. Dolan v. U.S. Postal Serv., 546 U.S. 481, 486, 126 S.Ct. 1252, 1257, 163 L.Ed.2d 1079 (2006). As the panel opinion explains, the broader context of the Act establishes that the necessity requirement insures that a medical professional has made a particularized determination of medical relevance before harassing a patient about firearm ownership. See Wollschlaeger v. Governor of Fla., 814 F.3d 1159, 1181 (11th Cir. 2015), vacated, 649 Fed.Appx. 647 (11th Cir. 2016). Like the rest of the Act, this provision merely obliges health-care providers to focus on providing medical care of the highest quality in the exam room rather than pursuing some other agenda. See id. at 1182. Even in the First Amendment context, we do not require "perfect clarity and precise guidance.” Ward v. Rock Against Racism, 491 U.S. 781, 794, 109 S.Ct. 2746, 2755, 105 L.Ed.2d 661 (1989). I would find that the anti-harassment provision is sufficiently clear that a person of ordinary intelligence would understand what *1331 it forbids. That is all the clarity the constitution requires.

. Although I do not deny'that the Supreme Court long described the policy goal at the heart of the First Amendment as protecting the free marketplace of ideas, I wonder *1332 whether we have carried that ideal too far. As many commentators have noted, a flurry of recent First Amendment cases relying on this language has effectively constitutionalized the market-based ideology underlying neoliberalism. See Jedediah Purdy, Neoliberal Constitutionalism: Lochnerism for a New Economy, 77 Law & Contemp. Probs. 175, 198 (2014) (explaining the close parallel between a neoliberal conception of individual freedom concentrating- on "making consumption decisions, and deciding how to spend money more generally to advance one’s preferences” and the First Amendment). This market-based approach to the First Amendment effectively obliterates the classic distinction between heavily-protected political speech and other, lesser forms of expressive activity, like consumer spending. Id. By conceptualizing the First Amendment as unique protection for a "marketplace of ideas,” we implicitly accept that no real distinction exists between politics and markets, and so our ideas of freedom are interchangeable between these two spheres. Id. at 202. I admit to serious personal qualms regarding constitutionalizing any particular ideological framework, but I hope the alternative doctrinal framework I suggest infra satisfactorily resolves this creeping problem.

. Courts could also avoid the implications of Reed by applying a watered-down version of the traditional presumption of illegitimacy the application of strict scrutiny creates. See Reed, 135 S.Ct. at 2235 (Breyer, J., concurring). However, this ill-considered approach leads inevitably to much greater difficulty in defending the critical rights protected by the First Amendment in instances truly warranting strict scrutiny. See id. After all, "[s]peech is an essential mechanism of democracy ... [and] a precondition to enlightened self-government.” Citizens United, 558 U.S. at 339, 130 S.Ct. at 898. Speech deserves the very highest protection when the core principles at the heart of the First Amendment face a true threat.