IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86662-1-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JOSHUA JORDAN, | |
| Appellant, | |
| and | |
| PREHIRED, LLC, a Delaware limited liability company; PREHIRED RECRUITING, LLC, a Delaware limited liability company; PREHIRED RECRUITING, LLC, a Florida limited liability company; PREHIRED ACCELERATOR, LLC, a Florida limited liability company; KAISHA, LLC, a Wyoming limited liability company; and ISA PLUS, LLC, a Delaware limited liability company, | |
| Defendants. | |

HAZELRIGG, C.J. — Joshua Jordan, the founder, owner, and operator of Prehired LLC, appeals from the order of the trial court that denied his motion to dismiss the State's cause of action against him for operating, advertising, and soliciting to Washington consumers as a private vocational school without a license. Jordan asserts, among other challenges, that the private vocational school licensing requirement, as applied to him, unconstitutionally restricted his

right to free speech in violation of the First Amendment to the United States Constitution. We disagree and affirm.

FACTS

In 1986, our legislature adopted a bill entitled "Private Vocational Schools" (the "PVSA"), enacted with the intention of "protect[ing] against practices by private vocational schools which are false, deceptive, misleading, or unfair."[1] LAWS OF 1986, ch. 299, § 1. The PVSA defines such schools as "any location where an entity is offering postsecondary education in any form or manner for the purpose of instructing, training, or preparing persons for any vocation or profession."[2] RCW 28C.10.020(7). "'Education,'" as defined therein, includes but is "not limited to, any class, course, or program of training, instruction, or study." RCW 28C.10.020(4).

To effectuate its purpose, the PVSA requires an entity seeking to operate as a private vocational school in Washington to obtain a license prior to operation and prohibits private vocational schools from engaging in a broad range of commercial activity without a license, including, as relevant here, advertising or soliciting to consumers. RCW 28C.10.060, .090. The act also sets forth, among other things, a list of prohibited business practices that are false, deceptive, misleading or unfair and minimum operational standards by private vocational

---

[1] Although not specifically challenged in this matter, the legislature also enacted the PVSA in order "to help ensure adequate educational quality at private vocational schools." RCW 28C.10.010.

[2] The legislature expressly identified that the PVSA did not apply to certain other entities offering education, either due to their regulation elsewhere in the Revised Code of Washington or for other reasons. *See* RCW 28C.10.030.

schools. RCW 28C.10.110, .050. The act authorizes civil penalties and criminal sanctions for a violation of any of its provisions. RCW 28C.10.130-.140.

The facts giving rise to the lawsuit in this matter, unless otherwise indicated, are undisputed in light of the pleadings submitted by the parties.[3] Joshua Jordan was the founder, owner, operator, and sole member of Prehired LLC and related companies in other states.[4] During the entirety of the time in question, Prehired LLC never applied for, or otherwise obtained, a license from this State to engage in commercial interactions with Washington residents as a private vocational school.

In or around 2018, Prehired LLC described itself as an "online members-only workforce accelerator devoted to helping new members find employment in software sales." Prehired LLC offered a membership which granted access to "a training, mentoring, and networking program with the goal of having the member obtain a sales job." This program "primarily consist[ed] of its online course content and access to mentoring support, all with the goal to help enrolled consumers obtain a job in software sales, even if they have no prior experience."[5] As of May 2018, the program included

---

[3] These facts are undisputed in light of the State's amended complaint and Jordan's answer thereto later filed in this matter.

[4] Jordan's other companies included Prehired Recruiting LLC, a Delaware limited liability company, Prehired Accelerator LLC, a Florida limited liability company, and Kaisha LLC, a Wyoming limited liability company. In his later deposition testimony, Jordan acknowledged that he was the final decision-maker for Prehired LLC's business decisions, including signing agreements, hiring contractors, marketing, determining internal policies and procedures, and approving of scripts to be read by its contractors to members of the public.

[5] Prehired LLC characterized this job as a software sales development representative, "responsible for locating, researching, and contacting potential clients for the products or services sold by the company for which they work." The primary objective of a software sales representative was to "schedule a meeting between a prospective customer and an account executive for a software demonstration."

(1) approximately 15 hours of video, recorded by Jordan and made available to students via the internet; (2) approximately 30 "scripts, templates and checklists;" (3) access to Prehired[ LLC]'s group on the social media platform LinkedIn; and (4) access to mentoring by its staff, including via phone, e[-]mail, and online chat.

Prehired LLC "offered its [p]rogram to individuals from many states across the United States" and "generally advertised its [p]rogram on websites and social media across the U.S." Prehired LLC required consumers to sign a membership agreement in order to gain access to its program and a "consent form indicating that if they have an unpaid balance and fail to make satisfactory payment arrangements, their account 'may be placed with an external collection agency,' and they will become responsible for fees and costs associated with collection." During the time in question, Prehired LLC contracted with several Washington residents who signed its membership agreement and gained access to the information in its program.[6]

As part of its advertising in Washington, Prehired LLC placed an advertisement for a few months in the "Jobs" section of the Seattle-specific web page of craiglist.org,[7] representing to consumers that its "training program could lead to a '6-figure sales career' and that more than 90% of its graduates had found jobs earning an average of $69,000 in their first year." In 2018, Prehired LLC advertised itself as a "'sales training and job placement program.'" At that time, "Prehired [LLC] encouraged consumers to '[e]nroll now and join the ranks of

---

[6] Jordan, as the founder, owner, and operator of Prehired LLC, indicated that he "may have been involved in [Prehired LLC's] membership enrollment of several individuals, possibility including Washington residents."

[7] "Craigslist.org" is a website for placing and answering classified advertisements.

[Prehired LLC's] certified Science-Based Sales graduates and start [their] six-figure career in tech sales!'"[8] (Some alteration in original.)

In July 2019, Prehired LLC began offering consumers the ability to finance the cost of its program with an income share agreement (ISA). The ISA was "a financing tool that allow[ed] an individual to join Prehired[ LLC]'s [p]rogram without having to make an upfront payment." The parties agreed, per guidance from the federal Consumer Finance Protection Bureau (CFPB), that such agreements constituted private education loans.

According to the State's later-filed pleadings, the cost for consumers to access Prehired LLC's program ranged from roughly $2,500 in 2018 to $15,000 in 2019, and its "ISAs required consumers to make minimum payments equal to between 12.5% and 16% of their gross income for 4 to 8 years or until they have paid a total of $30,000, whichever is sooner." Additionally, the State asserted in its summary judgment motion that at least 67 Washington consumers enrolled in Prehired LLC's program, including 42 who signed ISAs in order to access it, and collectively paid $135,592.33.[9]

After Prehired LLC began offering ISAs to consumers and certain consumers, including Washington residents, defaulted on those agreements, Prehired LLC began to engage in collection efforts against them. Jordan later explained in deposition testimony that, to that effect, in late 2021 or early 2022, he formed two new companies, Prehired Recruiting LLC, in Delaware, and Prehired

---

[8] By 2022, Prehired LLC "began advertising its [p]rogram as a 'membership association' with 'lifetime benefits,' and a 'members-only workforce accelerator.'"

[9] Jordan did not rebut or otherwise contest this allegation.

Accelerator LLC, in Florida, for the express purpose of collecting payment on defaulted ISAs. Then, "[a]t the direction of Jordan," Prehired LLC transferred ownership of its ISAs to Prehired Recruiting and Prehired Accelerator,[10] among others, and they began to engage in collection actions on those defaulted ISAs.[11] Jordan acknowledged in his deposition testimony that as part of the debt collection efforts he instructed his staff to contact the employers of those consumers with defaulted ISAs, explain that their employee was in default, and request garnishment of the employee's paycheck.

In addition, in or about May 2022, Jordan "began contacting consumers who signed Prehired[ LLC]'s ISAs, including at least one Washington consumer, and asking them to sign a Settlement Agreement" that would "convert the consumer's ISA into an agreement to make recurring monthly payments to Prehired [LLC] for several years."

In June 2022, the State of Washington filed a complaint against Jordan and his companies. The State alleged that Jordan, through Prehired LLC, had violated the PVSA by engaging in unlicensed commercial interactions with Washington-based consumers as a private vocational school.[12] The State also alleged causes of action under the Consumer Protection Act[13] (CPA) for Jordan's and Prehired LLC's violations of the PVSA and for all of the named defendants' unfair and deceptive contractual and debt collection actions. The State sought civil remedies

---

[10] These ISAs were also transferred to defendant ISA Plus LLC.

[11] Prehired LLC sold certain ISAs to "ISA Plus and/or Strategic Loan Fund, LLC (SELF)," including selling "ISAs from Washington residents to ISA Plus/SELF."

[12] In addition to the licensing violations under the PVSA, the State also alleged that Jordan had engaged in unfair business practices under that act.

[13] Ch. 19.86 RCW.

and penalties as well as an award of attorney fees and costs. In his response to an interrogatory from the State, Jordan acknowledged that between May 2017 and July 2022 he personally received from Prehired LLC a net income, including salary and distributions, of $1,074,120.77. He also acknowledged in his deposition that he was the sole recipient of disbursements from Prehired LLC.

Three months later, Prehired LLC, Prehired Recruiting, and Prehired Accelerator—all Jordan's companies—filed voluntary petitions for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. The bankruptcy cases were subsequently transferred to the United States Bankruptcy Court for the District of Delaware, which later consolidated the cases for joint administration and converted the proceedings to Chapter 7 bankruptcy after the entities' bankruptcy estate became insolvent.

Around this time, in the legal action in Washington, the State amended its complaint and alleged two additional causes of action: that Jordan, among other things, had violated the Collection Agency Act[14] (CAA), and his CAA violations constituted per se violations of the CPA.[15] The State also sought civil remedies and penalties for those additionally alleged violations.

In April 2023, Jordan filed a pro se motion seeking to dismiss the State's claims against both him and Prehired LLC, arguing that the State could not prove any set of facts consistent with its amended complaint and the PVSA's licensure requirement was a restriction of his right to free speech under the First Amendment

---

[14] Ch. 19.16 RCW.

[15] The amended complaint also added two defendants, Jordan-owned-and-operated Kaisha LLC, discussed *supra*, and ISA Plus LLC, a Delaware-based company which had contracted with Jordan. ISA Plus was later dismissed from the case following a court order.

to the United States Constitution.[16]  The State opposed the motion and, in October, after adopting the State's characterization of the motion to dismiss as one brought pursuant to CR 12(c), the trial court denied Jordan's motion.

Meanwhile, the State, alongside nine other states, a California governmental entity, and the CFPB,[17] brought an adversarial proceeding against Prehired LLC, Prehired Recruiting, and Prehired Accelerator in the Delaware federal bankruptcy court alleging that those defendants' conduct as to the ISAs violated certain federal consumer protection acts and sought restitution for those students who had signed ISAs.  Jordan was not personally named in the federal bankruptcy action.

In November 2023, the bankruptcy court accepted a stipulated judgment from the parties, which, in pertinent part, ordered the cancellation of Prehired LLC's ISAs and entered a monetary judgment of $4,248,249.30 against the defendants to be used to redress the pecuniary losses, and interest thereon, of the affected consumers.  Shortly thereafter, in the Washington proceeding, the State filed a motion to voluntarily dismiss Prehired LLC and Jordan's other companies from the action, which the trial court granted.[18]

In December, the State moved for partial summary judgment on its claims pursuant to the PVSA, the CPA, and the CAA against Jordan in his individual capacity.  Jordan, for his part, moved for summary judgment dismissal of all of the

---

[16] Jordan's motion did not identify the civil rule of procedure on which his motion was based.

[17] These were the States of Oregon, Delaware, Minnesota, Illinois, South Carolina, North Carolina, Wisconsin, the Commonwealths of Massachusetts and Virginia, and the California Department of Financial Protection and Innovation.

[18] The other companies dismissed from this case were Prehired Recruiting LLC (Delaware), Prehired Recruiting LLC (Florida), Prehired Accelerator LLC, and Kaisha LLC.

State's claims against him in his individual capacity. The court granted the State's motion and denied Jordan's motion. In so ruling, the trial court found that the State was entitled to civil penalties against Jordan in the amount of $1,030,730 and restitution in the amount of $46,501.76 and granted the State's request for an award of attorney fees and costs. Following a trial on the remaining claims against Jordan, the court entered judgment against him and ordered that he pay the civil penalties and restitution contained in the order on summary judgment, as well as an award of $346,250.65 in attorney fees and $12,063.87 in costs.

Jordan timely appealed.

ANALYSIS

Jordan presents a constitutional challenge to the PVSA on First Amendment grounds. He also assigns error to the trial court's order that granted the State's motion for partial summary judgment on its claims against him in his individual capacity for his and his companies' private vocational school licensing violations, CAA licensing violations, and CPA unfair practices and denial of his motion for summary judgment. However, despite designating for appeal the trial court's order that denied his motion for summary judgment, Jordan does not specifically assign error to that order or present citation to the record, analysis, or legal authority to establish reversible error as to that order. As such, he has abandoned any challenge to that order.

Further, neither Jordan's motion to dismiss in the trial court nor his briefing in this appeal clearly articulates whether he presents a facial or as-applied constitutional challenge to the PVSA. However, we need not resolve this issue

because, as explained *infra*, the PVSA is constitutional as applied to Jordan in this matter. As such, the PVSA is therefore constitutional in some of its applications and, consequently, not facially invalid. *See United States v. Rahimi*, 602 U.S. 680, 693 (2024) (To prevail on a facial constitutional challenge, "the Government need only demonstrate that [the challenged statute] is constitutional in some of its applications. And here the provision is constitutional as applied to the facts of [the challenger's] own case.").

I.      The PVSA is Not Unconstitutional As Applied to Jordan

Jordan first asserts that trial court erred when it denied his motion to dismiss because the PVSA's licensing requirement is an unconstitutional restriction of the right to free speech under the First Amendment as applied to him.[19]  Jordan is incorrect.[20]

---

[19] His motion also argued that the PVSA's licensing framework was an unconstitutional prior restraint on his right to free speech. However, his appellate briefing does not reassert this basis. Therefore, he has abandoned that argument and we do not consider it.

[20] On appeal, Jordan does not challenge the trial court's adoption of the State's characterization of his motion to dismiss as one brought pursuant to CR 12(c). We review a CR 12(c) order de novo. *Zurich Servs. Corp. v. Gene Mace Constr., LLC*, 26 Wn. App. 2d 10, 19, 526 P.3d 46 (2023).

> Like a CR 12(b)(6) motion, the purpose of a CR 12(c) motion is to "determine if a plaintiff can prove any set of facts that would justify relief." *P.E. Sys., LLC v. CPI Corp.*, 176 Wn.2d 198, 203, 289 P.3d 638 (2012). On a CR 12(c) motion, "[f]actual allegations contained in the complaint are accepted as true." *Silver v. Rudeen Mgmt. Co.*, 197 Wn.2d 535, 542, 484 P.3d 1251 (2021). When applying the CR 12 standard, we grant the plaintiff the benefit of all reasonable inferences from the factual allegations in the complaint, as well as hypothetical facts consistent with the complaint. *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820, 830, 355 P.3d 1100 (2015).

*Id.* at 19-20 (alteration in original). We interpret statutes and constitutional provisions de novo. *State v. TVI, Inc.*, 18 Wn. App. 2d 805, 814, 493 P.3d 763 (2021), *aff'd*, 1 Wn.3d 118, 524 P.3d 622 (2023).

- 10 -

A.      Freedom of Speech Principles under the First Amendment

The First Amendment, which applies to the states through the due process clause of the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I.  Under the First Amendment, a "government . . . 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

When a regulation is challenged under the First Amendment as restricting the right to free speech, a threshold inquiry is whether the regulation at issue targets protected speech.  *See United States v. O'Brien*, 391 U.S. 367, 376 (1968).  If so, a related question is whether the regulation restricts such speech based on its content or whether the regulation is content-neutral.  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563-66 (2011).  Thereafter, the regulation is subjected to differing levels of scrutiny depending on whether it constrains, or is silent, as to the content of the speech in question.  *City of Austin,* 596 U.S. at 68 n.3.  As recently summarized by the Ninth Circuit Court of Appeals,

> [l]aws that regulate speech based on its content are presumptively unconstitutional and subject to strict scrutiny.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015).  Content-neutral laws, on the other hand, are subject to intermediate scrutiny.  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76, 142 S. Ct. 1464, 212 L. Ed. 2d 418 (2022).

*NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1015 (9th Cir. 2025).

The parties here dispute each of these issues with regard to whether the PVSA, as applied to Jordan, unconstitutionally restricts his freedom of speech. Accordingly, we consider each in turn.

> B.     Restrictions on Jordan's Protected Speech under the PVSA

Jordan broadly asserts that the PVSA's licensing requirement targets his protected speech. To the extent that the PVSA restricts certain of his protected speech while speaking as a private vocational school, Jordan is correct.

The United States Supreme Court has long recognized that the First Amendment "protects commercial speech from unwarranted governmental regulation." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761-62 (1976)). Commercial speech is "expression related solely to the economic interests of the speaker and its audience" and "not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Id.* at 561-62. Commercial speech includes the "informational function of advertising." *Id.* at 563. The Court has also repeatedly "held that the creation and dissemination of information are speech within the meaning of the First Amendment." *IMS Health*, 564 U.S. at 570; *see also City of Austin*, 596 U.S. at 72 (recognizing solicitation is protected speech). Relatedly, the Ninth Circuit, in considering whether the information conveyed in vocational training constituted protected speech, has reasoned that

- 12 -

[t]here can be little question that vocational training is speech protected by the First Amendment. [An individual's] "speech to [consumers] imparts a 'specific skill' or communicates advice derived from 'specialized knowledge.'" [*Holder v.*] *Humanitarian Law Project*, 561 U.S. [1,] 27 [(2010)]. "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011). And, important to this case, "[a]n individual's right to speak is implicated when information [they possess] is subjected to 'restraints on the way in which the information might be used' or disseminated." *Id.* at 568, 131 S. Ct. 2653 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984)).

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (some alterations in original).

Here, the State alleged that Jordan operated a private vocational school. In so doing, he advertised his school to consumers. He also, through the operation of his school, sought to disseminate information in his possession regarding software and software sales to those consumers. Jordan did not at any relevant time apply for or obtain such a license prior to operating or advertising as a private vocational school.

The PVSA requires "[a]ny entity desiring to operate a private vocational school" to "apply for a license." RCW 28C.10.060. The PVSA defines "[t]o operate" as "to establish, keep, or maintain any facility or location where, from, or through which education is offered or educational credentials are offered or granted to residents of this state, and includes contracting for the performance of any such act." RCW 28C.10.020(12). The act also mandates that a "private vocational school . . . shall not conduct business of any kind, make any offers, advertise or solicit, or enter into any contracts unless the private vocational school

is licensed under this chapter." RCW 28C.10.090. In addition, the act authorizes penalties and sanctions for noncompliance with its provisions, including its licensing requirement. *See* RCW 28C.10.130-.140. Therefore, as relevant here, before a private vocational school can operate, advertise, or solicit, the PVSA requires such a school to obtain a license from the State.

The State's invocation of the PVSA plainly targets Jordan's protected speech. As set forth, *supra*, advertising, soliciting, and dissemination of information constitute speech protected by the First Amendment. Jordan seeks to advertise and solicit to consumers as a private vocational school about his school and to disseminate to consumers information in his possession regarding software and software sales. However, the PVSA requires him to obtain a license prior to advertising or soliciting on any topic and prior to operating as a private vocational school, irrespective of the education to be provided, and authorizes penalties against him if he does not comply. The act thereby expressly burdens Jordan's ability to advertise and solicit to consumers as a private vocational school about his program and has the effect of burdening his ability to disseminate the information in his possession to consumers as a private vocational school. Thus, Jordan is correct to the extent that when he speaks as a private vocational school the PVSA targets his protected speech.

C.    Content Neutrality and the PVSA

Jordan next contends that the PVSA constitutes a content-based restriction on his protected speech. Because the act, as applied to Jordan, restricts his protected speech based only on class or type, rather than on topic, subject matter,

or viewpoint, its restrictions are content neutral and his contention on this point fails.

### 1. United States Supreme Court Precedent Controls

Two decisions by the United States Supreme Court, its 2015 decision in *Reed v. Town of Gilbert* and its 2022 decision in *City of Austin v. Reagan National Advertising of Austin*,[21] are particularly instructive here. These decisions, and their relationship with one another, were recently well summarized by the Ninth Circuit sitting en banc in *Project Veritas v. Schmidt*, 125 F.4th 929 (9th Cir. 2025), *cert. denied sub nom.*, *Project Veritas v. Vasquez*, No. 24-1061 (U.S. Oct. 6, 2025).

> In 2015, the Supreme Court decided *Reed v. Town of Gilbert*, a case concerning a sign code that imposed varying restrictions on different types of signs—ideological signs, political signs, and temporary directional signs. 576 U.S. 155, 159-60, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015). The code imposed the most stringent restrictions on temporary directional signs. *Id*. at 160, 135 S. Ct. 2218. A local church that had displayed temporary signs to direct people to its upcoming services challenged the statute after it was cited for violating the code's restrictions. *Id.* at 161, 135 S. Ct. 2218.
> The *Reed* Court held that the Town of Gilbert's sign code was facially content based because the restrictions that applied to a given sign "depend[ed] entirely on the communicative content of the sign." *Id.* at 164, 135 S. Ct. 2218. "If a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government." *Id.* Although the town may have had a benign purpose in enacting the code, *Reed* stated that courts must "consider[] whether a law is content neutral on its face before turning to the law's justification or purpose." *Id.* at 166, 135 S. Ct. 2218.

*Project Veritas*, 125 F.4th at 947-48 (alterations in original).

---

[21] We note that the Court's 2022 decision in *City of Austin* was issued nearly a year before Jordan filed his motion to dismiss in this matter in April 2023.

The Ninth Circuit then discussed the Supreme Court's subsequent "clarifying decision" in *City of Austin* that undercut the reasoning in one of the circuit's decisions broadly interpreting *Reed*. *Id.* at 948. According to the Ninth Circuit, in *City of Austin*,

> the Court considered a First Amendment challenge that centered on a distinction in Austin's sign code between off-premises signs (*i.e.*, signs that advertise goods or services available at a location separate from where the sign was installed) and on-premises signs (*i.e.*, signs that advertise goods or services available at the location of the sign). [*City of Austin*, 596 U.S.] at 66, 142 S. Ct. 1464. Because the regulatory scheme drew "distinctions based on the message a speaker convey[ed]," *Reed*, 576 U.S. at 163-64, 135 S. Ct. 2218, the plaintiff argued it was content based. *City of Austin*, 596 U.S. at 69, 74, 142 S. Ct. 1464. *City of Austin* firmly rejected the proposition that a "regulation cannot be content neutral if it requires reading the sign at issue," *id.* at 69, 142 S. Ct. 1464, and emphasized *"that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral," id.* at 72, 142 S. Ct. 1464. Ultimately, *City of Austin* held that Austin's sign ordinance was content neutral because it "require[d] an examination of speech only in service of drawing neutral, location-based lines." *Id.* at 69, 142 S. Ct. 1464.

*Project Veritas,* 125 F.4th at 948 (emphasis added) (alterations in original). Elaborating on the Court's reasoning in *City of Austin*, the Ninth Circuit continued as follows:

> To further illustrate this controlling principle, *City of Austin* relied on earlier Supreme Court cases addressing restrictions on solicitation. "To identify whether speech entails solicitation, one must read or hear it first," but Supreme Court precedent has long held that "restrictions on solicitation are not content based and do not inherently present 'the potential for becoming a means of suppressing a particular point of view,' so long as they do not discriminate based on topic, subject matter, or viewpoint." [*City of Austin,* 596 U.S.] at 72, 142 S. Ct. 1464 (citation omitted).
> *City of Austin* cited the Court's prior decision in *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S. Ct. 2559, 69 L. Ed. 2d 298 (1981). *See City of Austin*, 596 U.S. at 72, 142 S. Ct. 1464. There, the Court confronted a Minnesota

statute that limited sale, distribution, and solicitation activities at the Minnesota State Fair to a particular location within the fairgrounds. *Heffron*, 452 U.S. at 643-44, 101 S. Ct. 2559. The case arose when Krishna practitioners were prohibited from distributing religious literature and soliciting donations outside the designated location at the fair. *Id.* at 646, 655, 101 S. Ct. 2559. The Court observed that the statute was not "based upon either the content or subject matter of speech," noting that the statute applied "evenhandedly to all who wish to distribute and sell written materials or to solicit funds." *Id.* at 648-49, 101 S. Ct. 2559 (citation omitted). Thus, although the statute implicated the content of speech—in the sense that its application turned on whether the speech could be characterized as "solicitation"—it did so in a manner that was neutral with respect to the message that individual speakers expressed. *Id.*; *see also City of Austin*, 596 U.S. at 73-74, 142 S. Ct. 1464 (rejecting the view that examination of speech "inherently triggers heightened First Amendment concern"). The Minnesota statute did not evince an intent to favor or disfavor a particular message or speaker.

Further illuminating this threshold principle, *City of Austin* drew upon *Members of City Council of Los Angeles v. Taxpayers for Vincent*[, 466 U.S. 789 (1984)]. *See* 596 U.S. at 73, 142 S. Ct. 1464. There, the Court concluded that an ordinance prohibiting posting signs on public property was content neutral, even though the law included exemptions for, among other things, markers commemorating "historical, cultural, or artistic event[s]." *Taxpayers for Vincent*, 466 U.S. at 791 n.1, 804, 817, 104 S. Ct. 2118. The Court noted that the "general principle" forbidding a government from "favor[ing] some viewpoints or ideas at the expense of others" had "no application" because there was "not even a hint of bias or censorship in the City's enactment or enforcement of" the ordinance at issue. *Id.* at 804, 104 S. Ct. 2118; *see also Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 43, 48, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986) (concluding that a zoning ordinance that placed restrictions on the location of movie theatres based on whether they presented adult content was content neutral because it was not aimed at "suppress[ing] the expression of unpopular views").

*Project Veritas,* 125 F.4th at 948-49 (some alterations in original). From this, the

Ninth Circuit reasoned that

[t]hese precedents recognize that the "the rationale [for] the general prohibition" on content-based regulations "is that content discrimination raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188, 127 S. Ct. 2372,

- 17 -

168 L. Ed. 2d 71 (2007) (internal quotation marks omitted) (quoting *R.A.V.* [*v. City of St. Paul*], 505 U.S. [377,] 387 [(1992)]). This concern is present not only when a regulation discriminates on the basis of viewpoint, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995), but also when a regulation restricts "discussion of an entire topic," *Consol. Edison Co. of N.Y. v. Pub. Comm'n of N.Y.*, 447 U.S. 530, 537, 100 S. Ct. 2326, 65 L. Ed. 2d 319 (1980). *See Reed*, 576 U.S. at 168-69; *see also id.* at 182, 135 S. Ct. 2218 (Kagan, J., concurring in the judgment).

Critically, *City of Austin* reaffirmed that this concern is not necessarily implicated by every regulation that depends on the content of protected speech. *See City of Austin*, 596 U.S. at 73-74, 142 S. Ct. 1464. Put another way, not every regulation that turns on the content of speech in the loosest sense is content based in the constitutional sense. *A regulation may remain content neutral despite touching on content to distinguish between classes or types of speech—such as speech that constitutes solicitation*, *Heffron*, 452 U.S. at 649-50, 101 S. Ct. 2559, or speech that draws neutral, location-based distinctions, *City of Austin*, 596 U.S. at 69, 142 S. Ct. 1464—so long as it does not discriminate on the basis of viewpoint or restrict discussion of an entire topic. *See City of Austin*, 596 U.S. at 73-74, 142 S. Ct. 1464; *Reed*, 576 U.S. at 168-69. 135 S. Ct. 2218. Thus, a regulation that restricts speech involving solicitation, or involving a police officer, may be content neutral. As the Supreme Court has plainly stated, regulations that "confer benefits or impose burdens on speech *without reference to the ideas or views expressed* are in most instances content neutral." *Turner* [*Broad. Sys., Inc. v. FCC*], 512 U.S. [622,] 643 [(1994)] (emphasis added).

*Project Veritas*, 125 F.4th at 949-50 (emphasis added) (some alterations in original).

### 2. The PVSA is Content Neutral As Applied to Jordan

Applying the foregoing principles to the matter before us, the PVSA is content neutral as applied to Jordan. Although the act's licensure requirement burdens his ability to speak as a private vocational school and with regard to a class or type of speech such as advertising, soliciting, or educating, the PVSA does so in a content-agnostic manner.

First, the PVSA is content neutral on its face. As set forth, *supra*, the licensing requirement set out in the PVSA expressly burdening a private vocational school's ability to advertise or solicit does not identify a specific topic, subject matter, or viewpoint about which advertising is prohibited but, rather, prohibits *any* advertising or soliciting by unlicensed private vocational schools. *See* RCW 28C.10.090. Similarly, in burdening a private vocational school's ability to operate and thereby implicitly burdening its ability to disseminate educational information in its possession to consumers, the act is disinterested as to the educational content sought to be provided by such a school, defining "education" as including, but "not limited to, *any* class, course, or program of training, instruction, or study." RCW 28C.10.020(4) (emphasis added). Insofar as Jordan seeks to advertise, solicit, or educate as a private vocational school, the PVSA's licensing requirement is silent as to the particular content of such speech.

Furthermore, the PVSA is not motivated by an improper purpose or premised on an improper justification. Indeed, "[t]he government may ban forms of communication *more likely to deceive the public than to inform it.*" *Cent. Hudson*, 447 U.S. at 563 (emphasis added). As set forth, *supra*, our legislature enacted the PVSA with the intention of "protect[ing] against practices by private vocational schools which are false, deceptive, misleading, or unfair." RCW 28C.10.010.

Here, the State's complaint against Jordan and Prehired LLC was predicated on his false, deceptive, misleading, and unfair practices, not based on the subject matter, topic, or viewpoint of the information about which he sought to

advertise, solicit, or educate. Jordan does not otherwise present us with evidence indicating an improper motivation or justification on the part of the legislature generally or the State in this suit. Thus, he has not established that "there is evidence that an impermissible purpose or justification underpins" the PVSA's facially content neutral restriction. *See City of Austin*, 596 U.S. at 76.

> 3. Jordan's Assertions of Constitutional Infringement are Unavailing

Jordan's briefing nevertheless advances several assertions in support of the proposition that the PVSA's licensing framework sets forth a content-based restriction of his protected speech. However, each of these assertions fails.

Jordan first relies on certain reasoning set forth in the Ninth Circuit's decision in *Pacific Coast Horseshoeing.* However, subsequent decisional authority by the United States Supreme Court and the Ninth Circuit has undercut that reasoning.

In *Pacific Coast Horseshoeing*, the Ninth Circuit panel ruled that a statute regulating a private vocational school seeking to provide education on horseshoeing was content based. There, the court held that the challenged statute restricted speech based on its content, "[i]n sum," because it "'requires authorities to examine the contents of a message to see if a violation has occurred.'" 961 F.3d at 1073 (quoting *Tschida v. Motl*, 924 F.3d 1297, 1303 (9th Cir. 2019) (citing *McCullen v. Coakley*, 573 U.S. 464, 479-80 (2014))). Two years later, however, the Supreme Court in *City of Austin* firmly rejected this analytical framework stating,

The Court of Appeals interpreted *Reed* to mean that if "[a] reader must ask: who is the speaker and what is the speaker saying" to apply a regulation, then the regulation is automatically content based. This rule, which holds that a regulation cannot be content neutral if it requires reading the sign at issue, is *too extreme an interpretation of this Court's precedent*.

596 U.S. at 69 (emphasis added) (alteration in original) (citation omitted). Consequently, the Ninth Circuit, sitting en banc in 2025, noted that it had relied on the same extreme interpretation in *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018) and recognized that the Court's *City of Austin* decision "undercut [that] reasoning." *Project Veritas*, 125 F.4th at 948. Therefore, the Supreme Court, as well as the Ninth Circuit, though not mentioning *Pacific Coast Horseshoeing* by name, rejected the aforementioned reasoning therein. Thus, Jordan's reliance on *Pacific Coast Horseshoeing* in this regard is misplaced.

Jordan next relies on *Pacific Coast Horseshoeing* and the Court's decision in *IMS Health* in support of the notion that the PVSA regulates the content of his speech because the act sets forth both a speaker-based and content-based regulation of speech. Jordan's reliance, as applied to this matter, is unavailing.

He correctly identifies that the regulations at issue in *IMS Health* and *Pacific Coast Horseshoeing* not only expressly identified disfavored speakers (pharmaceutical manufacturers and private vocational schools, respectively) but also disfavored content (the marketing of prescriber-identifying information and the dissemination of information on horseshoeing). *See IMS Health*, 564 U.S. at 564; *Pac. Coast Horseshoeing*, 961 F.3d at 1070-72. Here, although the PVSA plainly disfavors private vocational schools as speakers and restricts certain of such schools' protected speech, the act is, as analyzed herein, neutral as to the topics,

subject matter, and viewpoints that such a school might seek to express. Thus, Jordan's reliance on the foregoing decisional authority is ineffective.[22]

Finally, Jordan asserts that because the PVSA indicates that its provisions apply only to private vocational schools and do not apply to entities providing professional, vocational, avocational, and recreational education, the PVSA restricts his speech based on its content. Again, Jordan is incorrect.

As an initial matter, although RCW 28C.10.030 sets forth that the PVSA's provisions do not apply to certain education-providing entities, it does not logically follow that such entities are unregulated by the State, and a brief review of its subsections reveals as much. *See* RCW 28C.10.030(1)-(11). Furthermore, Jordan fails to present argument or analysis in support of the notion that he is subjected to a different burden in this case than the education providers excluded by that statutory provision.

In addition, as discussed herein, the mere fact that a statute that distinguishes between categories of speakers who seek to disseminate information does not constitute a content-based restriction on speech. Nor, for that matter, does identifying those speakers as professional, vocational, avocational, or recreational, without more, convert the PVSA into an improper content-based regulation. Indeed, "restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *City of Austin*, 596 U.S. at 72. Jordan does not present persuasive argument or authority in

---

[22] Jordan also does not present any analysis or decisional authority in support of the proposition that a regulation is unconstitutional if it targets disfavored speakers without also targeting the specific content of their speech.

support of the notion that such categorization of speakers either facially, or in effect, burdens speech based on the subject matter, topic, or viewpoints sought to be disseminated by such speakers. Thus, for the foregoing reasons, the PVSA is content neutral as applied to Jordan, and his assertions to the contrary fail.[23]

### D. The PVSA As Applied to Jordan Survives Intermediate Scrutiny

The State asserts that intermediate scrutiny is the appropriate standard by which to review the PVSA and, under such scrutiny, the PVSA is constitutional. As to both assertions, we agree.

Because the PVSA sets forth a content-neutral restriction on protected speech, we review the challenged portions of the act with intermediate scrutiny. *See City of Austin*, 596 U.S. at 76. "[T]o survive intermediate scrutiny, a restriction on speech or expression must be 'narrowly tailored to serve a significant governmental interest.'" *Id.* (internal quotation marks omitted) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Under that standard, a law will survive review "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) (*Turner* II).

"Untruthful speech, commercial or otherwise, has never been protected for its own sake." *Va. State Bd. of Pharmacy*, 425 U.S. at 771; *see also IMS Health,*

---

[23] Given that the PVSA is content-neutral and intermediate scrutiny applies, and given the court's analysis in *City of Austin*, 596 U.S. at 76, we need not resolve whether the PVSA specifically regulates commercial speech, non-commercial speech, or an inextricable intertwining of both. *See TVI*, 1 Wn.3d at 130-31.

564 U.S. at 579 ("[T]he government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech,'" with such harms including "'the risk of fraud.'" (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 426 (1993); *R.A.V.*, 505 U.S. at 388-89)); *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 638 (1985) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading.").

Here, the State's cause of action against Jordan pursuant to the PVSA sought to protect Washington consumers against fraudulent, deceptive, misleading, or unfair practices by his private vocational school. *See* RCW 28C.10.010. The act does so, in large part, by requiring him to obtain a license prior to operating as a private vocational school and, generally speaking, by prohibiting him from engaging in commerce as a private vocational school without a license.

The PVSA, as applied to Jordan, serves a significant governmental interest and is narrowly tailored to serve that interest. Preventing the dissemination of untruthful speech is an important governmental interest. *Va. Pharmacy Bd.*, 425 U.S. at 771. The United States Supreme Court has long recognized that "[u]ntruthful speech, commercial or otherwise, has never been protected for its own sake." *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 and n.10 (1961)). In addition, the PVSA does not burden substantially more of Jordan's speech than necessary to

achieve the legislature's interest. As discussed, the act imposes a burden on his ability to operate and engage in commerce as a private vocational school without first obtaining a license from the State, which has the effect of burdening his ability to engage in advertising and dissemination of information as a private vocational school. However, such a framework is well-tailored to promoting the State's interest in combatting untruthful speech by private vocational schools; if Jordan cannot speak in commerce to Washington consumers as a private vocational school, he cannot engage in fraudulent, misleading, deceptive, or unfair practices in commerce as such a school. The PVSA's interference in his protected speech, therefore, is in "proportion to the interest served." *See In re R.M.J.*, 455 U.S. 191, 203 (1982).[24]

Thus, the PVSA's licensing requirement is narrowly tailored to serve a significant governmental interest. Accordingly, as applied to Jordan, the PVSA does not set forth an unconstitutional restriction on his right to free speech under the First Amendment.

II.     Summary Judgment against Jordan Individually under the PVSA, CPA, and CAA was Proper

Jordan next contends that the trial court erred when it granted the State's motion for partial summary judgment on the PVSA, CPA, and CAA claims against him in his individual capacity. The trial court did not err.

---

[24] Although the Court's decision in *City of Austin* did not expressly identify that a content neutral law must also leave open adequate alternatives for the burdened speech, we conclude that the PVSA does so as applied to Jordan. Despite the provisions of the PVSA, Jordan remains able to advertise and disseminate information regarding software and software sales, he must merely do so either with the required license or outside of the means of a private vocational school.

A.      Standard and Scope of Summary Judgment Review

We recently set forth the applicable standard of review as follows:

> We . . . review a trial court's order granting a motion for summary judgment de novo.  *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 776, 249 P.3d 1044 (2011).  We undertake the same inquiry as the trial court and consider the evidence and the reasonable inferences from it in the light most favorable to the nonmoving party.  *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982); *Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).  Summary judgment is appropriate where there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  CR 56(c); *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 164, 273 P.3d 965 (2012).  By cross moving for summary judgment, the parties concede there are no material issues of fact.  *Pleasant v. Regence BlueShield*, 181 Wn. App. 252, 261, 325 P.3d 237 (2014) (citing *Tiger Oil Corp. v. Dep't of Licensing*, 88 Wn. App. 925, 930, 946 P.2d 1235 (1997)).

*Hobbs v. Hankerson*, 21 Wn. App. 2d 628, 632, 507 P.3d 422 (2022) (some alteration in original).  Furthermore,

> [o]nce the moving party shows there are no genuine issues of material fact, the nonmoving party must bring forth specific facts to rebut the moving party's contentions.  [*Elcon Constr.*, 174 Wn.2d at 169.]  The nonmoving party must put forth admissible evidence showing the existence of a triable issue.  [*Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986).]  It cannot rely on the allegations contained in its pleadings, conclusory statements, or speculation.  [*Elcon Constr.*, 174 Wn.2d at 169; *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989).]  If the "nonmoving party *fails to controvert relevant facts supporting a summary judgment motion, those facts are considered to have been established*."  [*Cent. Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 354, 779 P.2d 697 (1989).]

*He v. Norris*, 3 Wn. App. 2d 235, 238, 415 P.3d 1219 (2018) (emphasis added) (footnotes omitted).

Here, the State moved for partial summary judgment on its causes of action against Jordan in his individual capacity for violating the PVSA, CPA, and CAA.  In

so doing, the State presented Jordan's responses in his answer to the State's amended complaint along with multiple declarations and hundreds of pages of exhibits (including numerous excerpts from Jordan's deposition). In reliance on those facts, the State argued that it was undisputed that: Jordan founded, owned, managed, and controlled Prehired LLC; he operated Prehired LLC as an unlicensed private vocational school; he knew he was violating Washington law; Prehired LLC solicited and advertised to Washington consumers; he caused Prehired LLC to enter into payment and financing contracts with Washington consumers without a license; he, personally and through his companies, collected and attempted to collect payments from Washington consumers without a license; and he personally benefited and profited from Prehired LLC's unlawful conduct.

In his opposition brief, Jordan argued that the State's causes of actions and remedies sought against him in his individual capacity deprived him of certain constitutional rights, were in violation of certain constitutional provisions, and misinterpreted the provisions of the CPA, PVSA, and CAA. In so doing, Jordan did not meaningfully controvert any of the relevant facts presented as undisputed in the State's summary judgment motion.

Also around this time, Jordan filed a motion for summary judgment dismissal against all the causes of action alleged by the State against him in his individual capacity. This necessarily included the State's claims brought against him pursuant to the PVSA, CPA, and CAA. As a result, both the State and Jordan conceded that there were no material issues of fact as to the causes of action brought under those statutory chapters. Therefore, the facts alleged by the State

were not only properly considered to have been established before the trial court, *see He*, 3 Wn. App. 2d at 238, but also were conceded as setting forth no genuine issue of material fact for trial, *see Hankerson*, 21 Wn. App. 2d at 632. The trial court later granted the State's motion and entered an order identifying numerous facts on which it relied in applying the law set forth in its order.

On appeal, Jordan does not meaningfully dispute whether those facts accurately represented the uncontroverted facts in this matter. Accordingly, the question before us is strictly whether the trial court correctly determined that the State was entitled to judgment as a matter of law in light of the facts before it and the causes of action presented in the State's motion.

B. Order Granting Partial Summary Judgment

Jordan asserts that the trial court erred when it determined that the State was entitled to judgment as a matter of law on the claims set forth in its partial summary judgment motion. Jordan's assertion fails.

1. Individual Liability under the PVSA, CPA, and CAA

The PVSA, CPA, and CAA are remedial statutes, which we construe liberally to serve their purposes. *See State v. Living Essentials, LLC*, 8 Wn. App. 1, 15, 436 P.3d 857 (2019). Our state Supreme Court, with regard to the CPA, has held that

> there is long-standing precedent in Washington holding that individuals may be personally liable for a CPA violation if they *"participate[] in the wrongful conduct, or with knowledge approve[] of the conduct." State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 322, 553 P.2d 423 (1976). Liability for such participation or approval does not depend on piercing the corporate

veil. *Id.* This is consistent with the CPA's plain language, which authorizes the attorney general to bring an action "against any *person* to restrain and prevent the doing of any act herein prohibited or declared to be unlawful," RCW 19.86.080(1) (emphasis added), and which defines "person" to include, "where applicable, natural persons," as well as corporate entities, RCW 19.86.010(1).

*State v. Arlene's Flowers, Inc.*, 193 Wn.2d 469, 535, 441 P.3d 1203 (2019) (emphasis added) (alterations in original).

Similarly, the plain language of the PVSA makes it unlawful for an "entity" to operate a private vocational school without a license, *see* RCW 28C.10.060, defines an "[e]ntity" to include "a person," *see* RCW 28C.10.020(6), and makes its unlawful for a private vocational school to engage in certain commercial activity without a license, *see* RCW 28C.10.090. The PVSA further sets forth that "[a]ny private vocational school *or agent* violating RCW 28C.10.060, 28C.10.090, or 28C.10.110 . . . is subject to a civil penalty." RCW 28C.10.130(1) (emphasis added). The act defines "[a]gent" broadly to include

> a person owning an interest in, employed by, or representing for remuneration a private vocational school within or without this state, who enrolls or personally attempts to secure the enrollment in a private vocational school of a resident of this state, offers to award educational credentials for remuneration on behalf of a private vocational school, or holds [themselves] out to residents of this state as representing a private vocational school for any of these purposes.

RCW 28C.10.010(2).

Liability under the plain language of the CAA parallels that of the CPA and the PVSA. The CAA authorizes, "[n]otwithstanding any other actions which may be brought under the laws of this state, the attorney general or the prosecuting attorney of any county within the state may bring an action in the name of the state

*against any person* to restrain and prevent any violation of this chapter." RCW 19.16.460. The CAA defines "[p]erson" as including an "individual, firm, partnership, trust, joint venture, association, or corporation." RCW 19.16.100(13). Taken together, it logically follows that an individual's liability under the plain language of the PVSA and the CAA does not depend on piercing the corporate veil, and as with the CPA, such an individual can be liable for violations of those acts if they participate in the wrongful conduct or with knowledge approve of it. *See Arlene's Flowers*, 193 Wn.2d at 535.

### 2.    PVSA Determination at Summary Judgment

Jordan first contends that the trial court erred when it concluded that the State was entitled to judgment as a matter of law on its PVSA claim against him in his individual capacity for his conduct and that of Prehired LLC. Jordan's argument fails.

As referenced in the trial court's order, the PVSA defines a "[p]rivate vocational school" as "any location where an entity is offering postsecondary education in any form or manner for the purpose of instructing, training, or preparing persons for any vocation or profession." RCW 28C.10.020(7). Under the PVSA, an entity seeking to operate, advertise, solicit, offer, or enter into contracts in Washington as a private vocational school must obtain or have a license beforehand. RCW 28C.10.060, .090. The PVSA authorizes, among other things, civil penalties for a violation of its provisions, *see* RCW 28C.10.130, and any violation of the PVSA "affects the public interest and is an unfair or deceptive

act or practice in violation of RCW 19.86.020 of the consumer protection act." RCW 28C.10.210.

Here, the following is uncontroverted:

- Jordan founded, owned, and managed several related companies, including Prehired LLC; exercised control over the companies' functions; and directed their operations.

- He, individually or through Prehired LLC, operated a postsecondary program of training that taught skills or knowledge for the purpose of preparing an individual for a vocation; and operated and conducted business in Washington.

- In so doing, he enrolled and contracted with at least 67 Washington consumers and advertised Prehired LLC's educational services online in Washington through Prehired LLC's website, such that Washington residents visited its website at least 17,073 times.

- During this time, Jordan did not apply for or obtain a license for Prehired LLC to engage in the aforementioned conduct as a private vocational school in Washington.

From these facts, the court concluded that Prehired LLC operated, advertised, solicited, offered, and entered into contracts in Washington as a private vocational school without a license and Jordan, either personally or through Prehired LLC, participated in or knowingly approved of this conduct. Given this, the trial court correctly determined that Jordan was individually liable under the

- 31 -

PVSA, that his conduct violated the PVSA, and that each of his PVSA violations also constituted a CPA violation. The trial court did not err in so concluding.

Jordan nevertheless contends that he cannot be liable for Washington consumer's visits to Prehired LLC's website because "the State did not allege it sought to hold Mr. Jordan liable for website visits." However, the State's amended complaint plainly stated in paragraph 5.63 that "Prehired [LLC] also has advertised to Washington consumers . . . though its own website," the State's amended pleading otherwise repeatedly references Prehired LLC's website, and the State's PVSA cause of action against him expressly references the text of RCW 28C.10.090 prohibiting a private vocational school from advertising without a license. Thus, Jordan's contention fails.

Jordan next asserts that the trial court's imposition of civil penalties against him under the PVSA and the CPA for Washington consumers' visits to Prehired LLC's website was an unconstitutional restriction of his right to free speech under the First Amendment. However, he does not present analysis, statutory interpretation, or persuasive citation to the record in support of the applicability of the single decisional authority on which he relies for his assertion. Therefore, we decline to consider this aspect of his argument on appeal. *See* RAP 10.3(a)(6).

Jordan also contends that the trial court erred when it determined that Prehired LLC's website advertising constituted a violation of the PVSA because, according to Jordan, the PVSA "does not even regulate websites." Because we interpret the PVSA broadly and the PVSA prohibits, without qualification, advertising by an unlicensed private vocational school, this claim fails as well.

- 32 -

Thus, Jordan does not establish an entitlement to appellate relief in his challenges to the trial court's ruling on summary judgment as to the cause of action under the PVSA.

### 3. CPA Determination at Summary Judgment

Jordan next avers that the trial court erred when it concluded that judgment as a matter of law was warranted as to the State's claims against him under the CPA. Jordan is incorrect.

The trial court properly identified that the CPA forbids "unfair and deceptive acts or practices in the conduct of any trade or commerce," RCW 19.86.020, and that a CPA violation may be established as injurious to the public interest on the basis that it "had the capacity to injure other persons." RCW 19.86.093(3)(b).

Here, it is undisputed that Jordan, individually and through Prehired LLC, advertised, marketed, solicited business from and entered into contracts with Washington consumers; represented to at least 40 of those consumers who signed Prehired LLC's ISAs that the ISAs were not loans or debt; and, as to 42 of those signed ISAs, did not include the required Federal Trade Commission's "Holder Rule" language.[25]

---

[25] As described in a footnote by the Ninth Circuit in *Kilgore v. KeyBank, National Ass'n*, 718 F.3d 1052, 1056 n.3 (9th Cir. 2013),

> The Federal Trade Commission promulgated the Holder Rule in 1975 in response to concerns that sellers of goods and services were increasingly separating "the consumer's duty to pay from the seller's duty to perform" either by selling loan instruments to a third party after execution or by acting as a conduit between purchasers and third-party lenders. Promulgation of Trade Regulation Rule and Statement of Basis and Purpose, 40 Fed. Reg. 53,506, 53,507 (Nov. 18, 1975) (emphasis omitted) (codified at 16 C.F.R. pt. 433). The Rule requires consumer credit contracts to include the following language: "ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF

Taken together, the court reasoned that Jordan, individually and through Prehired LLC, engaged in trade or commerce under the CPA with Washington consumers, variously misrepresented the nature of the ISAs as financial instruments to those consumers, and failed to include the federally-required language in those financial instruments provided to and signed by those consumers. Given this, the court concluded that Jordan participated in and knowingly approved of Prehired LLC's conduct, such conduct constituted unfair and deceptive acts and practices in trade or commerce, and such misrepresentations and omissions had the capacity to deceive a significant number of consumers and, therefore, violated the CPA. The court did not err in so concluding.[26]

As part of its CPA determination, the court also identified that the PVSA sets forth that contracts for payment to an unlicensed private vocational school are unenforceable, *see* RCW 28C.10.180, and the public interest can be implicated under the CPA when, among other things, the alleged acts were committed in the

---

GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF." 16 C.F.R. § 433.2(a).

[26] Jordan nevertheless asserts that the trial court erred when it determined that he misrepresented to Washington consumers that the ISAs were not loans or debt. This is so, he contends, because the court relied on the State's argument in its summary judgment motion that, in turn, was predicated on guidance issued by the federal CFPB either during or after the ISAs in question were signed. Therefore, according to Jordan, the trial court's order had the effect of retroactively punishing him for his conduct.

However, we need not address this issue because Jordan waived it during the pleadings stage of this case. Paragraph 5.36 of the State's amended complaint alleged that the "United States Department of Education and the [CFPB] have found that ISAs used to finance expenses for postsecondary education are private education loans." And, in his answer, Jordan responded, "*Prehired Defendants admit the allegations in Paragraph 5.36 with respect to the Consumer Financial Protection Bureau*, but are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the U.S. Department of Education." (Emphasis added.) Thus, for the purpose of this case, Jordan admitted that his ISAs were loans. Accordingly, his assertion fails.

course of a defendant's business, part of a pattern of conduct by the defendant, and affected many consumers. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 789-90, 719 P.2d 531 (1986).

It is uncontroverted here that Jordan, individually and through Prehired LLC, operated an unlicensed private vocational school in Washington, represented to Washington consumers that Prehired LLC's ISAs were enforceable, demanded and collected 175 payments from those consumers pursuant to the terms of those ISAs, and, in attempting to collect payment on defaulted ISAs, contacted and settled the obligation identified in the ISAs with five of those consumers.

From this, the court concluded that Jordan participated in and knowingly approved of Prehired LLC's conduct, such actions violated the CPA because Prehired LLC's ISAs and other contracts for payment arising from its operation of an unlicensed private vocational school were unenforceable, his actions in seeking to enforce those unenforceable contracts were unfair under the CPA, and such actions were committed in the course of his business, part of his pattern of conduct, and harmed many Washington consumers. Thus, the court did not err when it concluded that Jordan was individually liable under the CPA.[27]

---

[27] On appeal, Jordan asserts that the State relied on the responsible corporate office doctrine to establish his individual liability. Jordan is incorrect, as the State plainly relied on his participation and knowing approval of the misconduct here to establish his individual liability. Additionally, to the extent that Jordan asserts that because he did not know that his conduct was improper he is not liable under the CPA, this assertion fails as well. We interpret the CPA broadly and therefore focus on a defendant's knowledge of the conduct itself, not whether such conduct was improper.

4.    CAA Determination at Summary Judgment

Finally, Jordan argues that the trial court erred when it determined at summary judgment that he was individually liable under the CAA as a matter of law.  Again, his assertion fails.

As identified by the trial court, the CAA prohibits the operation as a collection agency or an out-of-state collection agency in Washington without a license, *see* RCW 19.16.110, and sets forth that a violation of RCW 19.16.110 constitutes an unfair or deceptive act or practice in the conduct of trade or commerce under the CPA, *see* RCW 19.16.440.  The trial court also correctly reasoned that Jordan and his companies acted as collection agencies and out-of-state collection agencies as defined in RCW 19.16.100(4) and (12).

Here, it was uncontroverted that Jordan, either himself or through his companies, never obtained a license as a collection agency in Washington, transferred and assigned past due ISAs to his other companies for the express purpose of collection, filed six collection actions in Delaware against Washington consumers, and directed one of his companies to file arbitration claims against three Washington consumers.  From this, the trial court properly determined that Jordan participated in or knowingly approved of the foregoing collection activities and such collection activities violated both the CAA and the CPA.  Therefore, Jordan's assertion fails.

Thus, the trial court did not err when it granted partial summary judgment to the State on its PVSA, CPA, and CAA claims against Jordan in his individual capacity.  Accordingly, Jordan does not establish an entitlement to appellate relief.

III.     Attorney Fees

Both Jordan and the State request an award of attorney fees on appeal pursuant to RAP 18.1(b) and RCW 19.86.080(1) of the CPA, which provide the court discretion to grant such an award to the party that substantially prevails in an action.  As set forth herein, the State has substantially prevailed and Jordan has not.

Therefore, we exercise our discretion and grant the State's request for an award of attorney fees contingent upon its compliance with the procedural requirements of the Rules of Appellate Procedure.

Affirmed.

WE CONCUR: